**UNITED STATES of America**

v.

**Glenn I. WRIGHT, Appellant.**

**UNITED STATES of America**

v.

**Dennis MOSS, Appellant.**

Nos. 85–5206, 85–5207.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 9, 1985.

Decided Feb. 18, 1986.

---

Lawrence H. Schwartz, Washington, D.C., Appointed by this Court, for appellant in No. 85–5206.

William E. O'Brien, Arlington, Va., Appointed by this Court, for appellant in No. 85–5207.

Andrew Fois, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell, Thomas J. Tourish, Jr. and Charles J. Harkins, Jr., Asst. U.S. Attys., Washington, D.C., were on brief for appellee in Nos. 85–5206 and 85–5207.

Before WALD and STARR, Circuit Judges, and McGOWAN, Senior Circuit Judge.

WALD, Circuit Judge:

Glenn I. Wright and Dennis Moss were tried jointly before a jury on several charges stemming from the kidnapping of a wealthy player from a bridge tournament in Washington, D.C. At trial, Moss testified that he carried out the abduction at the direction of Wright but asserted that he participated in the kidnapping only under duress exerted by Wright. Wright, whom all witnesses portrayed as the principal planner and instigator of the kidnapping, presented an insanity defense. The jury found each defendant guilty of the charges against him, and these appeals followed. We now affirm the conviction of each defendant. We find that the trial judge did

not err in rejecting Wright's motions for severance or in permitting Wright to take the stand and to agree to certain stipulations. We also find that although the trial judge made occasional erroneous evidentiary rulings affecting Moss, Moss incurred no substantial prejudice from the cumulative effect of these erroneous rulings.[1]

## I. BACKGROUND

The facts of the actual kidnapping were undisputed at trial. Edith Rosenkranz was abducted at gun point from a Washington, D.C. hotel where she was participating with her husband in a contract bridge tournament. The abduction was carried out by Dennis Moss on July 19, 1984. The events leading up to the kidnapping, also in large part undisputed, are these: In July of 1984, Wright's Texas-based financial consulting business was collapsing, and by July 10th Wright had formed a plan to kidnap a wealthy female bridge player in Washington, D.C. On that day, Moss and Wright met for the first time at the Midnight Sun Bar in Houston, Texas. The exact circumstances surrounding this meeting *were* the subject of controversy at trial. Wright testified that he met Moss by chance at the bar, that he probed Moss about his willingness to engage in a daring yet profitable undertaking, and that Moss said he had the courage to go along with Wright's money-making scheme. Moss, on the other hand, testified that he went to the Midnight Sun Bar because he received a phone call and that while he was at the bar Wright threatened to kill both Moss and his family if Moss did not cooperate in an undisclosed scheme. Moss also testified that his fear of Wright as a result of these threats was rational because Wright revealed an awareness that Moss had previously laundered money for narcotics dealers in Florida and that Moss' house had been burned down when he attempted to withdraw from this activity. According to

Moss, Wright also knew certain details about Moss' family in Florida.

The meeting at the Midnight Sun Bar was followed the next day by a meeting at Wright's apartment. On July 13th, Wright flew to Washington, D.C. with his roommate Orland Tolden[2] and checked into a hotel in Thomas Circle. Moss went to visit his sister in Norfolk and then drove to meet Wright in Washington, D.C. Wright's original plan called for Moss to impersonate a bridge tournament referee and lead Mrs. Rosenkranz away from the tournament in which she and her husband were participating. This effort failed. The next day Wright gave Moss a gun and sent Moss back to try again. This time Moss succeeded. Moss drove his victim to Norfolk, Virginia and held her inside an Econo Lodge Motel until July 21st. Both Moss and Mrs. Rosenkranz testified that Moss repeatedly told Mrs. Rosenkranz that someone had taken his baby daughter, that people were watching them, and that both Moss and Mrs. Rosenkranz might be killed if she disobeyed Moss. On July 21st, Moss drove back to Washington with Mrs. Rosenkranz. He then called the victim's husband and instructed him to place a million dollars in ransom money underneath a car in the parking lot of a Washington area hospital. After collecting the money, Moss drove to the hotel in Thomas Circle and picked up Wright. Wright and Moss proceeded to the Washington Monument where they released their victim unharmed. Immediately thereafter, the FBI arrested Wright and Moss.

## II. WRIGHT'S ARGUMENTS ON APPEAL

### A. *Severance on the Basis of Inconsistent Defenses*

██ Wright argues on appeal that the trial judge erred in denying his repeated motions for severance. Wright requested severance on the ground that he and Moss

---

1. Counsel for Wright and for Moss were appointed by this court. Each has represented his client in a manner consistent with the finest traditions of the legal profession. We express our deep appreciation to counsel for their admirable job.

2. Tolden was a third participant in Wright's kidnapping scheme. Tolden entered into a plea agreement with the government and testified at trial as a government witness.

would assert inconsistent and hostile defenses. The decision to sever the trial of a defendant who has been properly joined for trial with a co-defendant under Rule 8 of the Federal Rules of Criminal Procedure is committed by Rule 14 of the Rules of Criminal Procedure to the discretion of the trial court; an appellate court can review a denial of a motion for severance only for abuse of discretion. *See, e.g., United States v. Haldeman,* 559 F.2d 31, 71 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). What constitutes an abuse of discretion necessarily depends on the facts of each case. *United States v. Johnson,* 478 F.2d 1129, 1133 (5th Cir. 1973). This circuit has repeatedly articulated, however, that the denial of a severance motion generally constitutes an abuse of discretion when "the defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Rhone v. United States,* 365 F.2d 980, 981 (D.C.Cir. 1966); *see also United States v. Haldeman,* 559 F.2d at 71; *United States v. Ehrlichman,* 546 F.2d 910, 929 (D.C.Cir. 1976), *cert. denied,* 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977). Reversals under this standard, however, require a high degree of conflict between the defenses. In *United States v. Ehrlichman,* 546 F.2d at 929, for example, we declined to overturn the denial of severance because "[t]here would have been no logical inconsistency in the jury's acceptance of the defenses presented by both defendants." After examining the details of Wright's theory of insanity and Moss' theory of duress, we do not find that the defenses present a sufficient degree of antagonism to require reversal of the trial judge. The presence of some hostility between Wright and Moss, and Moss' strategy of exculpating himself by inculpating Wright do not by themselves require separate trials. *E.g., United States v. Ehrlichman,* 546 F.2d at 929.

Wright points to two specific areas of conflict between his insanity defense and Moss' duress defense which he argues mandate severance. First, Wright argues that in order to present a duress defense, Moss had to show that Wright exercised control over Moss while Wright's insanity defense required Wright to show that he was unable to control himself. This argument for severance rests on an illusory conflict between the two defenses and greatly overreads Wright's insanity defense. To present an insanity defense under the then applicable law in the District of Columbia, Wright had to show that at the time of the kidnapping he was suffering from a "mental disease or defect" and that as a result of that disease or defect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. *See United States v. Brawner,* 471 F.2d 969 (D.C.Cir.1972). Wright's psychiatrist, Dr. Hirschman, testified that Wright suffered from a narcissistic personality disorder which amounted to a mental disease or defect and that this disorder rendered Wright unable to appreciate the wrongfulness of his actions. Nothing in Dr. Hirschman's theory of Wright's mental illness was inconsistent with Wright's potential to coerce Moss into carrying out the kidnapping scheme. To the contrary, Dr. Hirschman testified both that Wright was aggressive and that his thought processes were precise and logical. Dr. Hirschman also implied that Wright was quite capable of manipulating others. Tr. 957, 973. Dr. Hirschman never suggested that Wright's insanity caused him to be "out of control" in a sense that would preclude him from coercing Moss into carrying out the kidnapping.

The second purported conflict between the defenses of Wright and Moss concerns the death of Wright's former lover Tony Ivey. In Dr. Hirschman's opinion, one substantial factor contributing to Wright's mental illness and to the resulting kidnapping scheme was Wright's anguish over the violent murder of his lover, Tony Ivey. According to Dr. Hirschman, the death of Ivey, when compounded by the loss of Wright's mother from Alzheimer's disease

and by his financial ruin, exacerbated his mental disorder and drove him to the kidnapping. Dr. Hirschman explained that Wright had an overpowering need to take back what he thought society owed him for taking his mother, his lover and his business.

Wright's defense presented Ivey as one of the few people Wright had ever loved, a person whose violent death was a substantial cause of the kidnapping scheme. Moss' defense presented the Wright-Ivey relationship in an entirely different light. Moss testified that Wright told Moss that he had managed to have Ivey murdered without incurring police suspicion. The implication drawn by Moss was that Wright could also arrange to have Moss and his family killed if Moss failed to cooperate. On appeal, Wright argues that this aspect of Moss' defense undermined his presentation of the death of Ivey as a plausible motivation for the kidnapping and made it virtually impossible for Wright to establish the necessary degree of mental illness for a credible insanity defense.

We acknowledge this second conflict between the two defenses is a real one; however, not every conflict between defenses offers a sufficient ground to reverse a denial of severance by a district judge. We do not find the magnitude of the conflict sufficient to render the defenses as a whole so contradictory as to raise an appreciable danger that the jury would convict because of the inconsistency. The inconsistent treatment of the Wright-Ivey relationship would not logically require a jury to find Wright guilty if it acquitted Moss. We cannot accept Wright's characterization of the conflict between the defenses as undermining the core of his defense; the conflict simply did not go to the heart of Wright's insanity defense. To the contrary, the death of Ivey was only one of several factors leading up to the crime. More importantly, Wright's insanity defense was not contradicted solely or even primarily by Moss' defense. The government presented substantial evidence of its own to attack Wright's insanity defense. *Cf. United*

*States v. Leonard,* 494 F.2d 955, 966–67 (D.C.Cir.1974).

### B. *The Danger of Prejudice from a Joint Trial*

■ Consideration of these two specific conflicts between the duress and insanity defenses does not exhaust our treatment of the severance issue. We must next examine the closely related question of whether the failure to sever effectively denied Wright a fair trial. Wright raises numerous reasons why he could not obtain a fair trial when tried jointly with Moss. Even though we find that Wright incurred some disadvantage from the joint trial, we do not find that the district court abused its discretion in not ordering a severance.

Rule 14 of the Federal Rules of Criminal Procedure countenances some prejudice to a defendant from a joint trial. Rule 14 provides that "If it appears that a defendant ... *is prejudiced* by a joinder ... the court *may* order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires" (emphasis added). Hence, Rule 14 does not require reversal of a denial of severance merely because a defendant "might have a better chance of acquittal if tried separately." *See, e.g., United States v. Wilson,* 434 F.2d 494, 501 (D.C.Cir.1970). We *will* reverse a denial of severance, however, where the failure to sever denies the defendant a fair trial. We must inquire, therefore, whether Wright was deprived of a fair trial.

Wright first claims that he was denied a fair trial because testimony by Moss that Wright murdered Tony Ivey and threatened to kill Moss and his family, including his eight-year-old daughter, was so inflammatory that no jury would be able fairly and impartially to consider Wright's defense. Wright's counsel renewed his motion for a severance immediately after Moss testified that Wright told him that if he did not cooperate, "I will blow your family away." Tr. 1418–19. Wright's counsel also made a motion for severance at the time of Moss' testimony about

Wright's version of Tony Ivey's death. Tr. 1272–77, 1453. The prejudice alleged here should be distinguished from the prejudice resulting from inconsistent defenses. In Part II.A, *supra,* we considered whether Moss' duress defense might tend to undermine the *factual* predicate of Wright's insanity defense. Here, on the other hand, we must examine whether certain aspects of Moss' defense might engender in the jury so severe a visceral reaction against Wright that the jury might convict him solely on that basis. While we find the question close, we cannot find that the district court abused its discretion in denying a severance on the basis of the inflammatory aspects of Moss' defense. We perceive no substantial danger that the jury convicted Wright on the basis of emotion rather than logic. The suggestion that Wright murdered Tony Ivey was effectively discounted at trial. The evidence at trial showed that Wright could not have murdered Ivey because he had been at the office in the company of others at the time of the murder. Wright testified that the police investigation after the murder suggested that the three black youths were responsible for the murder. The district court specifically assessed the impact of the Ivey incident on the jury. In denying a motion for severance the district court explained that "when Wright took the stand, he established his candor, his directness, his objectivity with respect to the unfortunate events of this situation. I think it would be highly unlikely that the jury would put aside his own expressions concerning this man Ivey." Tr. 1277. While questions of credibility are, of course, for the jury, we think the trial record amply supports the district court's assessment of the impact of Moss' testimony on the jury. The trial court also agreed with Wright's counsel's characterization of Moss' testimony as "the most blatant perjury I have ever heard from a defendant in a criminal case." Tr. 1452. A district court is generally in a far better position to evaluate the prejudicial effect of potentially inflammatory testimony; consequently, we will reverse a district court's denial of severance only for abuse of discretion. Despite the potentially inflammatory nature of the evidence here, we do not conclude that its effect on the jury denied Wright a fair trial.

Wright also contends that he was prejudiced by the joint trial because counsel for Moss became in effect a second prosecutor. Wright attempts to link his case to those in which courts have found that the taking of an adversarial stance by counsel for a codefendant may deny a defendant a fair trial. *See, e.g., United States v. Johnson,* 478 F.2d 1129 (5th Cir.1973). After examining the trial record, we reject any characterization that this trial degenerated into a contest between the two defendants. Moss' counsel engaged in very limited cross-examination of Wright's witnesses. He did not cross-examine Wright either about murdering Tony Ivey or about his insanity defense. We therefore do not find this trial to have been "so prejudicial to the codefendant under multiple attack as to deny him a fair trial." *United States v. Sheikh,* 654 F.2d 1057, 1066 (5th Cir.1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982).

Wright next argues that the joint trial forced him to take the stand in order to defend against the allegation that he murdered Tony Ivey. To the extent that this argument relies on the Fifth Amendment privilege against compelled self-incrimination, we must reject the argument. The Fifth Amendment simply is not implicated when a defendant feels pressured to take the stand in order to rebut the evidence accumulated against him. *Cf. United States v. Shively,* 715 F.2d 260, 268 (7th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984). The real force behind this argument comes not from the Fifth Amendment but from the concern that the district court should not have allowed the introduction of Moss' testimony that Wright killed Ivey. We think, however, in light of the discussion above that the district court acted within the bounds of its discretion in admitting this evidence, and we cannot say that the prejudice to Wright was undue.

Finally, Wright argues that he was prejudiced by the joint trial because the jury was unable to compartmentalize the evidence against the two defendants. We reject this contention. The district court repeatedly ·charged the jury to consider Wright and Moss individually. *See* Tr. 1975, 2014–17. Moreover, Wright's counsel made no objection to the jury instructions on this basis. This case involved only two defendants and required the jurors to consider events of only a few days duration. Absent some more compelling showing of factual complexity, we find the danger of jury confusion to be minimal. *See United States v. Caldwell,* 543 F.2d 1333, 1360 (D.C.Cir.1974), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976).

## C. *Wright's Ability to Waive Constitutional Rights*

■ Wright also argues on appeal that the trial court failed to undertake a sufficiently searching judicial inquiry before permitting Wright to testify in his own defense and to agree to certain stipulations. Wright's counsel concedes, as indeed he must, that the district court's personal examination of Wright concerning his decision to testify would have been adequate had Wright not been asserting an insanity defense.[3] Counsel argues, however, that the trial judge had a duty to undertake a more rigorous inquiry because Wright's sanity was at issue and suggests that the court should have *sua sponte* ordered a psychiatric examination to determine Wright's ability to make a knowing and voluntary waiver of his fifth amendment rights.

A criminal defendant's waiver of any constitutional right must be knowing and intelligent. *E.g., Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Thus, the district court properly

questioned Wright about his decision to take the stand. Nothing in that colloquy— and nothing in the testimony of any of the psychiatrists at trial—suggests that Wright was unable knowingly and intelligently to choose to take the stand. Where a trial judge has personally interviewed a defendant, where nothing in any surrounding circumstances indicates that the defendant's mental condition has interfered with the waiver of constitutional rights, and where the defendant's own counsel does not request a psychiatric examination prior to the waiver, we will not reverse the district court's finding that the waiver was knowing and intelligent. We note here that Wright had a very high level of intelligence, *cf. United States v. Masthers,* 539 F.2d 721 (D.C.Cir.1976), and nothing in the record indicates that he might be incapable of making a reasoned choice to take the stand. Absent either the failure of a district court to examine the defendant or some evidence that a defendant's thought process was impaired, we cannot find that the district court erred in not ordering a psychiatric examination of Wright.

■ Wright relies on *United States v. Brown,* 428 F.2d 1100 (D.C.Cir.1970), to support his argument that the district court's acceptance of his stipulations was in error. In *Brown,* the district court accepted a defendant's stipulation that he had committed all acts charged in an indictment even though psychiatrists called by both the defendant and the government agreed that the defendant suffered from a mental disorder. This court reversed, holding that the trial judge was obliged to address the defendant personally to determine whether the defendant waived his rights voluntarily and with an understanding of the consequences of his action.[4]

Two separate considerations underlay our holding in *Brown,* neither of which is

---

**3.** The trial judge personally addressed Wright and explained to him that he did not have to testify in his own defense and that the prosecutor could not comment on any decision not to testify.

**4.** The trial judge in the instant case did address Wright personally before accepting the stipulations in evidence. Because we find that an inquiry of the type we mandated in *Brown* is not required on the facts of this case, we do not reach the issue of whether the district court's inquiry would be sufficient under *Brown.*

implicated in this case. Our first concern in *Brown* was the analogy between the stipulations and a guilty plea. We have in later cases generally limited *Brown*'s requirement to hold an inquiry of the type required by Rule 11 of the Federal Rules of Criminal Procedure to situations in which the stipulations entered are equivalent to a guilty plea. *See United States v. Lawson*, 682 F.2d 1012 (D.C.Cir.1982). No such inquiry is required where a defendant has not admitted his guilt and thereby waived trial on all issues. *See United States v. Strother*, 578 F.2d 397, 404 (D.C.Cir.1978). The stipulations agreed to by Wright do not even approximate an admission of the acts charged in the indictment and hence do not raise *Brown*'s concern that a defendant understand the consequences of a stipulated trial. *Cf. United States v. Strother*, 578 F.2d 397.

The second consideration in *Brown* was the obvious concern that the defendant's mental disorder might preclude him from making a voluntary and knowing waiver of his rights. We have reiterated *Brown*'s concern for mentally disturbed defendants in later cases. *See United States v. Dorsey*, 449 F.2d 1104, 1107–08 (D.C.Cir.1971). The present case poses a somewhat different question than that addressed in *Brown*, since Wright's stipulations are not analogous to a guilty plea. His stipulations did not waive his right to a jury trial and implicated only peripherally his privilege against compelled self-incrimination or his right to confront witnesses testifying against him. While the district court has a duty to ensure that the waiver of constitutional rights by a purportedly insane defendant is "an intentional relinquishment or abandonment of a known right or privilege," *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), we find that the trial judge adequately fulfilled this duty in the present case. Any implicit waiver of constitutional rights in the stipulations was so attenuated as to be analogous to the tactical decisions we permit defense counsel to make daily for any defendant. As Wright raises no claim of ineffective assistance of counsel and as

Wright was found competent to stand trial, we uphold the district court's acceptance of the stipulations.

III. MOSS' ARGUMENTS ON APPEAL

A. *Exclusion of Evidence of the Telephone Threat*

█ On appeal Moss raises four separate challenges to evidentiary rulings of the district court. His first and most compelling argument is that the district court erroneously prevented Moss from testifying to the contents of a threatening telephone call. Moss testified at trial that as he was preparing to go to work on July 10, 1984, he received a phone call directing him to go to the Midnight Sun Bar. Moss testified that he did not know who made the phone call, that he had never been to that bar before, and that he knew he would be contacted by someone at the bar. The plain import of Moss' testimony concerning his reaction to the phone call is that he did not go to the Midnight Sun of his own accord. When Moss attempted to relate the specific contents of what he was told over the phone, Wright's counsel objected to the evidence as hearsay and the district court sustained the objection.

Moss correctly points out on appeal that this testimony is not hearsay within the meaning of Fed.R.Evid. 801(c). The content of the phone call was offered not "to prove the truth of the matter asserted" but rather to show its effect on Moss. *See, e.g., United States v. Herrera*, 600 F.2d 502 (5th Cir.1979); *United States v. Cline*, 570 F.2d 731 (8th Cir.1978).

█ Although the district court incorrectly characterized the contents of the phone call as hearsay, Rule 103 of the Federal Rules of Evidence explicitly provides that "Error may not be predicated upon a ruling which ... excludes evidence unless a substantial right of the party is affected, and ... the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." Fed. R.Evid. 103(a)(2). Because Moss made no attempt to inform the district court of the

nature of the threats made to Moss in the phone call, we cannot assign the district court's ruling as error. Moss seeks to avoid the effect of Rule 103 by arguing that the substance of the telephone call was sufficiently apparent from the context of the questions posed to Moss on direct examination. The context of the question concerning the phone call does reveal that Moss changed his plans after receiving the call. Instead of reporting to his job at the loading dock of a Houston department store, Moss told his supervisor he was ill and went to the Midnight Sun Bar. This context does not, however, reveal whether the phone call put Moss in fear. An equally consistent interpretation might be that Moss was offered a chance to earn a great deal of money. This latter interpretation also squares with Moss' later testimony that at the bar he expected to meet people with whom he had previously been involved when he had laundered money for narcotics dealers.

We also do not find that the district court's decision qualifies as plain error affecting substantial rights under Fed.R. Evid. 103(d). The ruling did not gravely hamper Moss' presentation of his duress defense. Moss was able to testify to the direct threats made to him by Wright. He also testified that he knew unknown third parties were in league with Wright because while driving Mrs. Rosenkranz to Norfolk he had been stopped by two men and instructed to give his victim a sleeping pill. We therefore find that Moss incurred no significant prejudice from the erroneous ruling.

## B. Exclusion of Purportedly "Prior Consistent Statements"

 Moss also argues on appeal that the district court erred in preventing him from testifying concerning two statements he made to Mrs. Rosenkranz. One statement was made while he held Mrs. Rosenkranz at the Econo Lodge Motel in Norfolk, Virginia. The second statement was contained in a note Moss claimed to have written to Mrs. Rosenkranz but was unable to deliver prior to his arrest. The district court sustained Wright's objection to testimony concerning the first statement on the basis that the testimony was "self-serving" and rejected testimony as to the contents of the note as repetitious.

While we conclude that the district court should not have excluded the statement at the Econo Lodge merely because it was "self-serving," we find that Moss incurred no substantial prejudice from this erroneous ruling. Although the hearsay evidence might have been admissible under Fed.R. Evid. 803(3) as evidence of Moss' state of mind, the testimony was clearly cumulative. Moss testified to numerous other statements made to Mrs. Rosenkranz that they were being watched and that his daughter was being held by unknown individuals. Mrs. Rosenkranz also testified that Moss made such statements to her.

We also find that the district court properly excluded evidence of the contents of a note written by Moss to Mrs. Rosenkranz but never delivered to her. The district court rejected the evidence as repetitious. Moss testified that he wrote the note intending to give it along with a bouquet of roses to Mrs. Rosenkranz when she was released at the Washington Monument. Moss' counsel proffered that the note asked that Mrs. Rosenkranz' husband help Moss as she had promised he would. We find this testimony of marginal relevance and clearly cumulative as well. See Tr. 1461. Moss incurred no prejudice from its exclusion.[5]

---

5. Moss also argues that both his statements should have been admitted as prior consistent statements to rebut a charge of recent fabrication as permitted under Fed.R.Evid. 801(d)(1)(B). This argument misses its mark for two reasons. First, the evidence was not excluded because it was hearsay. Second, at the time the evidence was offered there had been no implied charge of recent fabrication. Wright had denied Moss' allegations of duress, but this general attack on Moss' credibility differs from a charge of recent fabrication. The time for Moss to have testified to a "prior consistent statement" would have been on redirect examination after the government suggested that he had invented his story after consulting with

### C. Exclusion of Wright's Threat to his Business Partner

 Moss next argues that the district court impermissibly prevented counsel for Moss from questioning Glenn Wright on recross-examination about an incident in which Wright quarreled with one of his business partners and threatened the partner with a gun. The district court excluded the questioning on the ground that it was beyond the scope of the redirect examination of Wright. We find that the district court correctly barred this line of questioning. Moss attempted to pursue this questioning, not in order to impeach Wright on the wholly collateral matter of the amicability of his relationship with his business partners, but in order to show that Wright coerced Moss into abducting Mrs. Rosenkranz. Rule 404(b) of the Federal Rules of Evidence clearly excludes evidence of other crimes to prove the character of a person for purposes of showing that he "acted in conformity therewith." Evidence that Wright pulled a gun on a business associate does not fit within the exception to the ban on character evidence for bad acts used as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *See* Fed.R.Evid. 404(b). This line of questioning therefore was properly excluded.[6]

### D. The Admission of Dr. Hirschman's Statement

Moss' final argument on appeal is that the district court erred in permitting Wright's psychiatrist to testify in response to the government's question on cross-examination concerning the basis for his diagnosis that:

> Mr. Wright told me that he went to a bar and then he met somebody, with whom

he talked, and that person indicated that he would do anything for money. And at that point, he interjected and said, "anything?" And then the plan came into effect.

Tr. 1001. Moss argues that this testimony was hearsay, that its inclusion denied his Sixth Amendment right of confrontation, and that the statement's inflammatory and prejudicial value far exceeded any probative value it might have.

 Dr. Hirschman's statement does not fall within the prohibition against hearsay evidence. Rule 703 of the Federal Rules of Evidence permits an expert witness to base his opinion on facts or data which would not be admissible as competent evidence so long as the facts or data are of a type reasonably relied on by experts in the particular field. Dr. Hirschman testified that he based his diagnosis in part upon Wright's own description of the events leading up to kidnapping. Moss does not argue on appeal that psychiatrists do not reasonably rely on conversations with their patients in arriving at a diagnosis.[7] Rule 705 of the Rules of Evidence provides that an expert may be required on cross-examination to disclose the facts or data underlying his opinion. Read together, Rules 703 and 705 reveal that the data underlying an expert's opinion which is elicited on cross-examination does not come in as substantive evidence. The data is admitted for the limited and independent purpose of enabling the jury to scrutinize the expert's reasoning. Thus, Dr. Hirschman's repetition of Wright's account of his meeting with Moss at the Midnight Sun Bar was not admitted as a true account of the meeting but only as the basis for Dr. Hirschman's insanity diagnosis. Since the account of the meeting between Wright and Moss was

---

"jailhouse" lawyers. Moss did not pursue this strategy at trial and we therefore cannot find that the two statements to Mrs. Rosenkranz should have been admitted on this basis.

**6.** The cases cited by Moss in which an accused offers evidence of the character of his victim are inapposite. Fed.R.Evid. 404(a)(2) creates a special exception to the general ban on the use of

character evidence to prove conduct in order to permit an accused to introduce evidence of the victim's character.

**7.** Moss argues on appeal only that the information was not *material* to Dr. Hirschman's diagnosis and therefore was of minimal probative value.

not "offered in evidence to prove the truth of the matter asserted," it falls outside the definition of hearsay provided by Fed.R. Evid. 801(c).

 Because Dr. Hirschman's testimony did not constitute inadmissible hearsay within the meaning of the Federal Rules of Evidence, it does not implicate the Confrontation Clause issue posed when hearsay evidence is admitted as *substantive* evidence against a defendant. *Cf., Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). This does not end our consideration of the Confrontation Clause, however. As the Supreme Court has pointed out, its Confrontation Clause cases group themselves into two distinct categories—those involving the admission of hearsay evidence and those involving restrictions on the scope of cross-examination. *See Delaware v. Fensterer*, — U.S. —, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam). Confrontation Clause concerns arise where the rules governing expert testimony are misused in order to bring otherwise inadmissible evidence before the jury without the opportunity for effective cross-examination. In some instances, even the most carefully drafted limiting instructions directing the jury not to consider a statement for its truth will prove insufficient to protect a criminal defendant. In the present case, however, we find that Dr. Hirschman's testimony does not fall within this sort of misuse of the Federal Rules of Evidence to evade the defendant's right to confront the witnesses against him. Wright himself testified at trial and related his version of how he met Moss. Moss therefore cannot credibly argue that he was denied his right to cross-examine Wright.

Finally, we find no plain error in the admission of Dr. Hirschman's statement. At trial, Moss did not make a Rule 403 objection that the danger of unfair prejudice greatly outweighed the probative value of Dr. Hirschman's statement; consequently, we can now review only for plain error. *See* Fed.R.Evid. 103(d). We do not find that Moss was substantially prejudiced by the district court's decision to allow Dr. Hirschman to relate Wright's account of his initial meeting with Moss. The statement that Moss "indicated that he would do anything for money" is not so prejudicially inflammatory under Fed.R.Evid. 403 as to require reversal of Moss' conviction.

IV. CONCLUSION

Having considered all of the arguments raised on appeal by the two defendants, we conclude that there was no reversible error in this case. Accordingly, the convictions of Glenn I. Wright and Dennis Moss are hereby

*Affirmed.*