UNITED STATES of America

v.

Lester H. FINOTTI, Jr., William H.
White, Sr., Carmine W. DePietro.

Crim. No. 88–0286 (HHG).

United States District Court,
District of Columbia.

Nov. 28, 1988.

Jay B. Stephens, U.S. Atty., John P. Dominguez, Asst. U.S. Atty., Washington, D.C., for Government.

Webster T. Knight, Washington, D.C., for defendant Lester H. Finotti, Jr.

Plato Cacheris, Dunnells, Duvall, Bennett & Porter, David P. Towey, Barbara Rowland, Adams, McCullough & Beard, Washington, D.C., for defendant William H. White, Sr.

J. Frederick Sinclair, Cohen, Dunn & Sinclair, Alexandria, Va., for defendant Carmine W. DePietro.

## MEMORANDUM AND ORDER

HAROLD H. GREENE, District Judge.

### I

William H. White, Sr., and Carmine W. DePietro, respectively the president[1] and vice president of the Southern Investment Co., who are defendants in this conspiracy-bribery case, have filed a motion in limine which, if granted, would have the effect of precluding the government from inquiring into a conversation between White and Hu-bert N. Cannon, an attorney on retainer by Southern, regarding the legality of the financial relationship between Southern and Lester H. Finotti, Jr., a government official and third defendant in this case. The motion arises in a rather complicated factual framework that must be described in some detail.

It is the theory of White and DePietro in response to the prosecution that they lacked the requisite criminal intent for the alleged violations in large part because of their understanding that Finotti had secured the permission of his superiors for his financial relationship with Southern, and that this permission, or their assumption that such permission had been given, took the relationship out of the realm of criminality. This theory is supported by the direct testimony of Sara Butler, an ex-employee of Southern, who participated in a meeting held shortly before lunch on March 1, 1985, at which all three defendants and Cannon were also present. In the course of that meeting, Cannon was asked whether it would be illegal for White and DePietro to place Finotti on Southern's payroll while he was also employed by the General Services Administration, an agency of the United States, to which Cannon replied, according to Ms. Butler, that, as long as Finotti had permission from his superiors, there would be no problem.[2]

However, the prosecution has proffered, and there is grand jury testimony to validate that proffer, that in a second, or continuation meeting just after lunch on March 1, White met alone with Cannon and that Cannon then advised White that, irrespective of any permission Finotti might have received from his superiors, a financial relationship with him under the circumstances contemplated by the Southern officials would be illegal and should not be consummated.[3] This subsequent advice ob-

---

1. White is also the company's sole stockholder.

2. The precise wording of the colloquy is not known for the recollections differ, particularly as between Ms. Butler and Cannon, but the substance is as related above.

3. Cannon testified before the Grand Jury as follows:

A. And Bill White said to me, "What do you think?" And I said, "Bill, I would not pursue this any further under any circumstances."
Q. Why?
A. I said, "It really doesn't matter what Mr. Finotti finds from his superior and I don't really care what it turns out that the federal statute or the regulations—there may be some

viously cuts directly across the White–DePietro defense. The current motion, together with the other events that will now be discussed, would, if granted, have the effect of revealing to the jury what was said by Cannon before lunch on March 1 but not what he told White after lunch on the same day.

## II

On November 17, 1988, before the start of the trial, White and DePietro moved in limine for a ruling to exclude any communications with Cannon that would be protected by the attorney-client privilege, and that the privilege was not abrogated by the crime-fraud exception. Although the issue was a close one, and although Chief Judge Robinson had ruled to the contrary during the grand jury phase of this case, this Court ruled at that time that the crime-fraud exception did not apply because the attorney's advice was not given in furtherance of a criminal design and that the defendants were therefore entitled to the protection of the privilege with respect to that advice. *See In re Sealed Case,* 754 F.2d 395 (D.C.Cir.1985); *In re Antitrust Grand Jury,* 805 F.2d 155 (6th Cir.1986); *In re Grand Jury Subpoenas Duces Tecum,* 798 F.2d 32 (2d Cir.1986). However, the current White–DePietro motion would convert the Court's earlier ruling from a shield into a sword, for it would expose the jury to only that half of the truth that supports the White–DePietro defense (Cannon's pre-lunch statements) but keep from it the other half (the post-lunch conversation in which the attorney contradicted his previous advice).[4] This is so because of events that have transpired since the Court's November 17 ruling, as follows.

In the November 17 ruling, as indicated, the Court held that the conversation between White and Cannon was protected by the privilege. The prosecutor subsequently sought a clarification from the court on the scope of that ruling. Specifically, the prosecutor was concerned that the defendants might be allowed to disclose the statements made during the pre-lunch meeting while keeping confidential the subsequent private meeting. Accordingly, the prosecution sought a ruling that if the defendants disclosed Cannon's remarks in the pre-lunch meeting,[5] then the defendants should be deemed to have opened the door permitting disclosure of the privileged, post-lunch communication. In response to this suggestion, the attorneys for White and DePietro proffered that they would not touch upon Cannon's remarks in the pre-lunch meeting and thus would not open the door. If that had been the end of it, the court's November 17 ruling would have remained intact and the jury would of course have been exposed neither to the pre-lunch advice nor to the post-lunch advice.

However, counsel for Finotti, during his opening statement, did make reference to Cannon and this first meeting. This prompted the prosecution to repeat its request for a ruling by the Court that the defendants had opened the door. The Court concluded that such a ruling was not yet ripe, and it refused the prosecution's request. Subsequently, counsel for Finotti advised the Court that he would seek to bring out Cannon's statement during the pre-lunch meeting when he cross-examines Ms. Butler (and presumable also with respect to other witnesses). The Court ruled that the cross examination could proceed on that basis,[6] and the prosecution immedi-

---

exception that you could possibly try to work out under, I don't know what those are. That's not my expertise. But in my judgment, in my legal opinion, any kind of an arrangement whereby you pay a federal employee in this situation will leave you open to grave challenge of conflict of interest." And I said, "It doesn't matter what Finotti comes back with as a proposal or what the arrangement is. I think you're so vulnerable that you cannot afford to do this."
Grand Jury Testimony of Hubert N. Cannon, January 8, 1987, at 27.

4. See note 3 *supra.*

5. The pre-lunch meeting was not privileged given the presence of third parties or "strangers", particularly Finotti, and no claim of privilege has ever been made for that meeting.

6. Following a hearing out of the presence of the jury, the Court concluded that the answers to such questioning could conceivably be exculpatory and that, since under Rule 403, Fed.R. Evid., it could not hold that the probative value was outweighed by possible prejudice (to other

ately countered that such cross examination would open the door to the entire subject of Cannon's statements that day, and that it should be allowed to inquire into the remainder of those statements. This prosecution request was followed, in turn, by the pending White–DePietro motion in limine, which, as indicated above, would now serve to keep out only Cannon's post-lunch advice. The Court will deny the defense motion for several reasons.

### III

■ First. White and DePietro argue that all that is involved here is the issue of waiver of the attorney-client privilege; that they have not waived that privilege; and that Finotti cannot waive it for them. The Court is not persuaded that this argument, which, on its face does not lack appeal, focuses on the true issue. The question of admitting the remainder of Cannon's statements arises, after all, in a trial setting in which the Court has the authority to rule that matter which would otherwise be inadmissible, may nevertheless be received in evidence because the "door was opened" by earlier trial events. *United States v. York*, 830 F.2d 885, 892 (8th Cir.1987); *United States v. Carter*, 801 F.2d 78, 83–84 (2d Cir.1986); *United States v. Taylor*, 728 F.2d 864, 874 (7th Cir.1984). To be sure, the decided cases have not dealt with this subject in the context of the attorney-client privilege [7] but that appears to be so only because the situation presently before the Court is so unusual as to be possibly unprecedented.[8] What is clear in any event is that the attorney-client privilege is not immutable but can be overborne in various circumstances.[9] The Court is of the view that this case presents such a circumstance.

■ It is true, of course, that the door is not being opened by White and DePietro but rather by their codefendant Finotti. However, these three defendants are jointly charged in a single conspiracy, and their defenses to the charge are not antagonistic but complementary.[10] Furthermore, it is not to impugn the purposes or motives of any of the defendants to conclude that the convergence of Finotti's effort to bring out the first Cannon conversation and the simultaneous White–DePietro effort to keep out the second Cannon conversation happens to suit the trial strategies of all three defendants extremely well.

There is also the factor that, objectively speaking, what defendants are seeking the Court to do would result in a gross distortion of the truth. The attorney-client privilege, like other privileges and evidentiary rules, sometimes keeps from the trier of fact the truth of what actually occurred, and this is accepted by the law when more important societal values are at stake. But there is present here a circumstance that is, at a minimum, unusual in privilege or other evidentiary situations—that under the defense motion one part of the facts constituting the "truth" would come to the attention of the jury but the remainder, a directly contradictory statement made by the same individual, will be kept from it.[11]

---

parties), the proposed cross examination would be proper.

**7.** Courts have found that parties may open the door to abrogate the related doctor-patient privilege. *See Keen v. Detroit Diesel Allison*, 569 F.2d 547, 553 (10th Cir.1978).

**8.** Neither party has cited any decisions directly on point, and in the limited time available, the Court has been unable to find cases presenting a fact situation similar to the one presented here.

**9.** Courts have established various exceptions and waivers to the attorney-client privilege, such as the crime-fraud exception, *In re Sealed Case*, 754 F.2d 395 (D.C.Cir.1985), and implicit waiver when the client places the advice of the attorney in issue or discloses part of the communication, *United States v. Aronoff*, 466 F.Supp. 855, 862 (S.D.N.Y.1979). *See generally*, 8 Wigmore, Evidence, § 2327, 2328, 2329 (discussing various waivers of the privilege).

**10.** All three rely on the alleged permission given to Finotti by his governmental superiors, and all three claim that such permission relieves them of criminal responsibility. White and DePietro appear to claim also that, even if there was no permission, they are relieved of responsibility if they merely reasonably believed that Finotti had permission.

**11.** The situation here is analogous to that addressed by Rule 106, Federal Rules of Evidence, which requires the contemporaneous introduction of the remainder of written or recorded

Such a result is not just; it is antagonistic to the truth-seeking purposes of a trial; and it need not be countenanced by the Court with its broad responsibility for ensuring a fair trial to all the parties.

Second. The force of these considerations is enhanced by the fact that we are dealing here with what essentially amounts to a single conversation or consultation with Cannon (at least insofar as White is concerned). The prosecution is not seeking to examine statements Cannon may have made at other times or to other individuals.[12] Cannon began his conversation with White and the others before lunch, and he went on immediately after lunch with the same conversation on the same topics with White alone.

▪ If this had been a single conversation, without a luncheon pause in between, White and DePietro could not be heard to argue, and the Court would not hold, that some part of the Cannon advice may be admitted but those portions not helpful to their defense should be carefully excised. *United States v. Aronoff,* 466 F.Supp. 855, 862 (S.D.N.Y.1979). Of course, they argue that they are not seeking to bring out the pre-lunch statements but that it is Finotti who is following that course. As noted above, however, the three all share the same basic defense and all three would be equally benefitted by a partial disclosure of the attorney's comments.[13] Moreover, in essence what we have here was a single conversation, even though the first part was held with one third party other than the defendants (the witness Sara Butler) present and the second part was carefully limited to Cannon and White.

▪ Third. Even if the situation before the Court is examined under the rubric of a waiver of the attorney client privilege, defendants will not prevail. The privilege can be waived implicitly as well as explicitly. *In re Sealed Case,* 676 F.2d 793, 807

statements when introduction of only a part would result in unfairness. As noted by Court of Appeals for this Circuit in *United States v. Sutton,* 801 F.2d 1346, 1368 (D.C.Cir.1986), Rule 106 is based on two considerations. The first is to correct a misleading impression created by taking matters out of context. The second is the inadequacy of repair work when delayed to a point later in the trial. In *Sutton,* the Court found that the rule applies to abrogate privileges when necessary for fairness. *Id.* at 1368. As that Court stated, "Rule 106 can adequately fulfill its function only by permitting the admission of some otherwise inadmissible evidence when the court finds in fairness that the proffered evidence should be considered contemporaneously." *Id.* Were it not for the fact that evidence at issue in this case is a conversation rather than a written or recorded statement, the Rule would be directly applicable. Nonetheless, the spirit of fairness underlying Rule 106 applies in this instance.

12. And of course the prosecution is not seeking to bring out advice that attorneys other than Cannon may have rendered to the defendant.

13. Defendants have argued that the problems of unfairness could be solved by severance of the defendants. If White and DePietro were now severed and tried separately, the jury in such a separate trial would never hear Cannon's remarks because presumably these defendants would not open the door to the issue. Severance is squarely within the Court's discretion. *United States v. Tarantino,* 846 F.2d 1384, 1398 (D.C.Cir.1988). In determining whether severance is required, the Court must balance prejudice to the defendant against the effective use of scarce judicial resources. *United States v. Nolan,* 700 F.2d 479, 482 (9th Cir.1983); *United States v. Daniels,* 770 F.2d 1111, 1119 (D.C.Cir. 1985) (Starr, J., concurring); Wright, Federal Practice and Procedure: Criminal 2d § 223. The admission of prejudicial evidence that would not otherwise be admissible is not alone grounds for severance, *Daniels, supra,* 770 F.2d at 1118, particularly once the trial has begun.

Defendants rely on *United States v. Wright,* 783 F.2d 1091 (D.C.Cir.1986), that severance is possible even after trial has begun. That is certainly correct. But in that case the Court of Appeals upheld a trial court decision against severance, and it noted, *inter alia,* that not every conflict between defenses offers a sufficient ground for reversal of a decision not to sever, and that denial of a severance constitutes an abuse of discretion only when the defendants—unlike the defendants here—present conflicting and irreconcilable defenses. 783 F.2d at 1094–95.

Beyond that, as noted above, we are confronted with what is charged as a single conspiracy, what is essentially a single conversation, and what constitutes the same defense basic to all three defendants. For these reasons alone, a severance is not appropriate and certainly not mandated. Finally, severance of these defendants would possibly require two three-week trials rather than one, imposing significant burdens on judicial resources. The request for severance is therefore denied.

(D.C.Cir.1982). As indicated above, a basic defense advanced by White and DePietro is that they lacked the requisite criminal intent in that they assumed that Finotti had permission from his superiors for his activities for Southern, and that such permission was sufficient to eliminate any possible illegality on their part. Since these defendants placed their criminal intent in issue in this manner, with legal advice concerning their reliance on the cleansing power of permission by Finotti's superiors being a component of that defense, they have waived any reliance on the privileged character of the advice that Cannon rendered to White to the effect that even if Finotti had permission the arrangement might be illegal. *See United States v. Tuchow,* 768 F.2d 855, 862 (7th Cir.1985) (defense of lack of intent opened door to permit introduction of prior bad acts).

The privilege was waived even more directly when White, during the investigation of the allegations in this case, stated to special agent Jack E. Hawkins that Southern's attorneys had been consulted and "had thoroughly reviewed the decision to employ Finotti after ... looking at the matter from nine different ways." [14] De-

fendants argue that the Hawkins testimony or his statement may not be admitted because (1) Chief Judge Robinson's ruling during the grand jury phase that there was no waiver is the law of the case, and (2) to admit the testimony or statement would create problems under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Neither of these points is well taken.

 Chief Judge Robinson's ruling is not binding here or even persuasive not only because that ruling dealt strictly with a grand jury problem rather than a trial situation, but also because the issue of admission of part of the truth but not all of the truth was not even remotely pending at that time. Moreover, Chief Judge Robinson's decision was made in the context of a ruling which held the crime-fraud exception to the attorney client privilege to be applicable—a ruling which is contrary to that made by this Court just prior to trial. As for the *Bruton* problem, Hawkins' statement may be redacted to eliminate any possibility of prejudice to the other defendants.[15] *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).[16]

---

14. The government has proffered that it is prepared to call Hawkins to the witness stand to testify concerning White's statements to him. The Court has also been furnished with Hawkins' written statement of his interview with White.

15. Defendants contend that the prosecution had previously argued that redaction would not be possible. However, the prosecution argument was made when the issue was whether all three of the defendants' statements could be redacted and admitted. In that context, the prosecution felt that redaction would not be possible. In the present posture, Hawkins' statement can easily be limited to refer to White only.

16. Counsel for White and DePietro argue that irreparable damage has been done to their defense because they had announced in their opening statements that their clients assumed that permission which Finotti had received would exonerate them. If the Cannon advice to White after lunch on March 1 is admitted, so it is claimed, the defense they announced early on will be discredited in the eyes of the jury and so will the credibility of the two defendants.

That argument might have some merit if nothing had occurred after the Court's November 17 ruling. However, on the morning of November 21, before the jury had been selected or opening

statements made, the prosecutor inquired of the Court, *inter alia,* whether he would be prohibited from inquiring into the Cannon–White meeting. The Court replied that it had on November 17 only ruled on the motion before it. Before it could provide any further guidance on the Cannon issues, it would have to know more about the various relationships in a concrete setting.

It is thus apparent that, if counsel went ahead with announcement of their defense strategy to the jury, it was done at their peril, for it was painfully obvious that the issue of a possible waiver of the privilege or of an open door with respect thereto was not resolved at that time but would have to await further events. And, as it turned out, the proposed cross examination by Finotti's counsel was just such an event. Counsel for the government prudently refrained from making reference to these issues in his opening statement.

It is intimated on behalf of the defendants that the events as they have now unfolded indicate that counsel may have been ineffective. However, not every tactical decision made by counsel in the course of a trial that turns out to have been wrong permits the inference that he was ineffective. The Court's observation of counsel in this case, and its knowledge of counsel more generally, cause it to determine that all defense counsel are of the highest professional

Fourth. As stated *supra*, the Court ruled on November 17, 1988, that the crime-fraud exception to the attorney client privilege did not apply because, so the Court then concluded, Cannon's statements to White in their post-lunch meeting were not made in furtherance of the criminal design. In support of this determination, the Court cited as typical of that conversation Cannon's statements in response to White's inquiry to the effect that even if Finotti had permission the arrangement might be illegal. *See supra* note 3. Given subsequent trial developments and motions, the Court can now far more clearly focus on the juxtaposition of that advice with Cannon's statement during the pre-lunch meeting that, according to Sara Butler, was to the effect that he saw no problems if Finotti received permission.

In light of the Butler testimony, it now appears that Cannon's consultations and statements may well have been made to further a criminal design. The pre-lunch advice, given in the presence of the entire group, when juxtaposed against the more confidential advice provided in secrecy only to White, might well permit the drawing of an inference that a concealment of crime was planned even at that time. Certainly, the conversations with Cannon were designed to make some on the inside—and potentially everyone on the outside—believe that permission from Finotti's superiors was enough to relieve the defendants of criminal responsibility (when, as only Cannon and White knew, this was not true). In short, Cannon's advice in the pre-lunch meeting could well have been part of a plan to lay the groundwork for a subsequent claim of lack of criminal intent and thus in furtherance of a crime or fraud.

On this basis, if there were no other way to prevent the unjust result of permitting the defendants to place before the jury legal advice that was retracted within an hour or two, without also making known to them the retraction, the Court would be prepared to reexamine its November 17, 1988 ruling and to hold that the Cannon statements taken in their entirety were made in furtherance of the criminal enterprise now before the Court and were therefore not protected by the attorney client privilege. However, inasmuch as the ruling announced *supra* already achieves that result, there will be no formal reversal of the November 17, 1988 ruling.

## IV

For the reasons stated, it is this 28th day of November, 1988

ORDERED that the defendant's motion in limine filed on November 23, 1988, be and it is hereby denied.

---

caliber. And Plato Cacheris, Esq., is of course known as one of the outstanding trial lawyers in the Washington area.