**UNITED STATES of America,**

**v.**

**Kevin GRAY, Rodney Moore, John Raynor, Timothy Handy, Lionel Nunn, Defendants.**

**United States of America**

**v.**

**Keith B. McGill, Defendant.**

**Nos. CRIM.00–157, CRIM.02–45.**

United States District Court, District of Columbia.

Nov. 19, 2003.

Heather D. Graham–Oliver, U.S. Attorney's Office, Washington, DC, for Petitioner.

Mitchell Stuart Baer, Washington, DC, David P. Baugh, Richmond, VA, L. Barrett Boss, Asbill, Moffitt & Boss, Chartered, Francis Darron Carter, Julie Sippel Dietrich, O'Toole, Rothwell, Nassau & Steinbach, Joan Draper, U.S. Attorney's Office, Eli Gottesdiener, Gottesdiener Law Office, Maria Carlotta Mendoza, U.S. Attorney's Office, Washington, DC, for Defendant.

Timothy John Heaphy, Glenn L. Kirschner, U.S. Attorney's Office, Washington, DC, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

LAMBERTH, District Judge.

Now before the Court are the New Trial Motions filed by Kevin Gray ("Gray"), Rodney Moore ("Moore"), John Raynor ("Raynor"), Timothy Handy ("Handy"), and Lionel Nunn ("Nunn"). Also, before the Court are the Government's Omnibus Opposition to Defendants' Motions for New Trial, and Kevin Gray's Reply to the Government's Opposition to His Motion for New Trial.

Upon consideration of the foregoing motions, the applicable law, and the record in this case, the Court, hereby, DENIES, the New Trial Motions filed by the aforementioned defendants.

## BACKGROUND

Gray, Moore, Raynor, Handy, and Nunn ("defendants") were indicted on criminal drug conspiracy and Racketeer Influenced Corrupt Organization ("RICO") charges. The defendants were also charged with substantive offenses based on violent acts, such as murder, murder-for-hire, burglary, robbery and assault. The defendants were tried by this Court from March 1, 2002 to March 13, 2003.

Specifically, the defendants in this case were tried on a one hundred and fifty eight-count Superseding Indictment. The defendants were tried on count one, Con-

spiracy to Distribute and Possess with Intent to Distribute Five Kilograms of More of Cocaine, Fifty Grams or More of Cocaine Base and One Kilogram or More of Heroin, and Marijuana, and count three, Conspiracy to Participate in a Racketeer Influenced Corrupt Organization. Some of the defendants were also tried on the following charges: continuing criminal enterprise; first degree murder while armed and aiding and abetting; continuing criminal enterprise murder and aiding and abetting; first degree felony murder while armed and aiding and abetting; assault with intent to murder while armed and aiding and abetting; tampering with a witness or informant by killing; violent crime in aid of racketeering activity and aiding and abetting; use of interstate commerce facilities in the commission of murder-for-hire; distribution of cocaine base and heroin and aiding and abetting; unlawful possession with intent to distribute cocaine base, cocaine, and heroin, and aiding and abetting; illegal use of a firearm; and unlawful use of a communication facility.

The defendants were also on trial for the murder of thirty-one individuals: Alvin Henson, Anthony Dent, Darrell Henson, Marvin Goodman, Christopher Burton, Scott Downing, Henry Lloyd, Aaron Jackson, Eric Moore, Corey Royster, Andrew Robinson, Ronald Powell, Dwayne Valentine, Joseph Thomas, Marco Smith, Ricardo Bailey, Garlan Baskerville, Joseph Jones, Diane Luther, Ervon Clyburn, Richard Simmons, Demetrius Green, Rodney Faison, Roy Cobb, Jaime Pereira, Ricky Fletcher, Carlos Cardoza, William Floyd, Thomas Walker, Anthony Watkins, and Derrick Edwards. In addition, the defendants are alleged to have committed eleven attempted murders.

After several weeks of deliberation, a jury convicted the defendants on a majority of the counts.

The deadline for post-trial motions, including motions for new trial, was originally set for March 10, 2003. However, the Court extended the deadline by ninety days from that date, resetting the deadline for June 10, 2003. Gray filed his Motion for New Trial on May 20, 2003. Moore filed his Motion for New Trial on June 8, 2003. Raynor filed his Motion for New Trial on March 10, 2003. Handy filed his Motion for New Trial on March 12, 2003. Nunn filed his Motion for New Trial, with additional leave of Court, on July 28, 2003. The government filed its Omnibus Opposition on October 1, 2003.

## LEGAL STANDARDS AND BURDENS

Pursuant to Federal Rule of Criminal Procedure 33, upon motion, a court may vacate any judgment and grant a new trial if such action would serve the "interest of justice." Fed.R.Crim.P. 33(a). A motion for new trial, based on grounds other than newly discovered evidence, must be filed within seven days of the verdict, or within such additional time as set by the court within those seven days. Fed.R.Crim.P. 33(b)(2).

The determination of whether to grant a motion for a new trial is "committed to the sound discretion of the trial judge, [and is subject to reversal] only for abuse of discretion or misapplication of the law." *United States v. Reese*, 561 F.2d 894, 902 (D.C.Cir.1977). The burden of demonstrating that a new trial would be "in the interest of justice" rests with the defendant, and is heavier when made more than seven days after the verdict. *Reese*, 561 F.2d at 902.

Applying the relevant legal standards and burdens to the instant case, the Court finds that none of the defendants assert bases sufficient to warrant a new trial. Even if the Court were to find validity in any of the bases asserted by

the defendants, any incorrect ruling by this Court would amount only to a harmless error, an error insufficient to grant a new trial. Pursuant to Federal Rule Criminal Procedure 52(a) "any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Fed. R. Crim P. 52(a). A defendant attempting to overcome the harmless error standard must demonstrate that the error swayed the jury so as to affect a substantial right of the defendant during trial. *Kotteakos v. United States*, 328 U.S. 750, 756, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (holding that the harmless error provision of the Federal Rules of Criminal Procedure simply paraphrases existing law that technical errors, defects or exceptions which do not affect the substantial rights of the parties are not grounds for reversal). As discussed below, none of the defendants successfully allege or demonstrate an error, much less one that adversely affected a substantial right. The denial of each motion is discussed in turn below.

### I. Motion by Kevin Gray for a New Trial

In his Motion for a New Trial and Reply to the Government's Opposition, Gray contends that the Court improperly admitted evidence of "other crimes" in violation of Federal Rules of Evidence 404(b). Gray maintains that the "other crimes" evidence was not sufficiently connected to the charged conspiracies to constitute direct proof of the charged crimes. Gray also argues that an indictment discrepancy, re-

lated to his motive for the murder of Anthony Watkins, warrants a new trial.

### A. Rule 404(b)

#### 1. Case Law

 The intent of Rule 404(b) [1] is to prevent the admission of evidence of other crimes for the purpose of demonstrating the bad character of the defendant by prejudicially revealing prior bad acts that have no evidentiary consequence to the criminal charges at issue. "Although stated as a restriction, the Rule is actually one of 'inclusion rather than exclusion.'" *United States v. Cassell*, 292 F.3d 788, 791 (D.C.Cir.2002) (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C.Cir.2000)). As such, Rule 404(b) only prohibits evidence that is "extrinsic" or "extraneous" to the charged crime. *United States v. Badru*, 97 F.3d 1471, 1474 (D.C.Cir.1996). However, evidence is not considered extrinsic or extraneous "if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime . . . ." *Badru*, 97 F.3d at 1474 (citing *United States v. Weeks*, 716 F.2d 830, 832 (11th Cir. 1983)). As long as evidence of the uncharged criminal conduct is offered as direct evidence of a fact in issue, and not as circumstantial evidence of the character of the accused, it is admissible independent of its superficial similarity to that which would be considered evidence of "other crimes" under Rule 404(b). *Badru*, 97 F.3d at 1475 (citing 22 *Charles A. Wright and Kenneth W. Graham, Jr.*, Federal Practice and Procedure § 5239 at 450

---

1. Federal Rules of Evidence 404(b):

Other Crimes, Wrongs, or Acts.—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

(1978)). Moreover, the decision of whether to admit evidence, including evidence of "other crimes," is within the sound discretion of the trial court, and will not be disturbed absent a showing of abuse of discretion. *Cassell,* 292 F.3d at 792.

### 2. *Indictment Charges*

The indictment charged Gray with leading decade-long narcotics and RICO conspiracies. The indictment alleged that the goals of the charged conspiracies were to obtain money and other things of value by trafficking cocaine, cocaine base (a.k.a. crack cocaine), heroin and marijuana, and committing acts of murder, murder-for-hire, burglary, robbery, assault and other acts of violence. *Superceding Indictment, Count 3, RICO Conspiracy.* The indictment also alleged that the acts of violence served to: 1) enrich the enterprise and its members; 2) create, maintain and control a marketplace for the distribution of its controlled substances; 3) enforce discipline among members of the enterprise; 4) protect the enterprise and its members from detection, apprehension and prosecution by law enforcement; 5) prevent and retaliate against acts of violence perpetrated against the enterprise and its members; and 6) promote and enhance the reputation and standing of the enterprise and its members. *Id.*

The "other crimes" evidence introduced by the government at trial, as discussed below, was direct proof of the existence, scope, method and goals of the criminal organization, and was, therefore, properly admitted consistent with Rule 404(b) and as independent intrinsic evidence of the charged crimes.

### 3. *Evidence Admitted Consistent With Rule 404(b)*

Gray's Rule 404(b) arguments evince an erroneously narrow view of the scope of the conspiracies charged. As discussed in greater detail in the ensuing subsections, Gray's opposition to the government's use of "other crimes" evidence hinges on his view that the indictment is narrowly tailored to include only core charges of purchase, storage, sale and distribution of narcotics, improperly designating these activities as the "main objective [sic] of both the narcotics and RICO conspiracies." See Gray Reply, pages 6–7. Gray maintains that any evidence that was not direct proof of purchase, storage, sale or distribution of narcotics was improperly introduced by the government and improperly admitted by the Court. Gray's contention is incorrect. In order to prove the narcotics and RICO conspiracy charges, the government had to prove, in part, the creation, existence, pattern, internal associations, ongoing nature and acts in furtherance of the charged conspiracies.[2] Each piece of evidence discussed below was direct proof of one or more of the elements that the government was obligated to prove, and was, as such, properly introduced and admitted.

### a. *Evidence of the murder of Alvin Henson was properly admitted.*

■ The government presented evidence that in 1989 Gray murdered Alvin Henson, a man who had been beaten Gray's uncle in a street fight. The government also introduced evidence that the murder occurred in a Southeast, Washing-

---

**2.** *United States v. Hoyle,* 122 F.3d 48, 50 (D.C.Cir.1997). (holding that conspiracy under Racketeer Influenced and Corrupt Organizations Act (RICO) requires the following proof: (1) existence of enterprise which affects interstate or foreign commerce; (2) that defendant "associated with" enterprise; (3) that defendant participated in conduct of enterprise's affairs; and, (4) that participation was through pattern of racketeering activity, i.e., by committing at least two acts of racketeering activity. 18 U.S.C.A. §§ 1961(1)).

ton, D.C. neighborhood where the organization sold drugs at the time.

The government introduced this evidence as proof of the organization's intention to gain a stronghold over this Southeast neighborhood by committing an act of violence so unwarranted and brazen that it would instill an immobilizing fear in the residents and competing drug dealers of the neighborhood. Relatedly, the government's evidence was further introduced to demonstrate that the murder successfully established Gray as a man of intimidating violence, a violent persona that he productively used to negotiate a more lucrative position in the organization and tighten its control over drug trafficking in that neighborhood.

Moreover, the government introduced the murder to establish the relationship between organization members Moore, Maurice Reid and Kenneth Gray, as well as direct proof of the murders and murder conspiracies charged in the case by introducing evidence that: 1) Maurice Reid helped Gray obtain a gun to commit the murder of Alvin Henson; 2) Moore and Maurice Reid hid Gray in area hotels in obstruction of police investigation into the murder; 3) Gray and other members also hid Gray's brother, Kenneth Gray, because he was an eyewitness to the Alvin Henson murder; and 4) Gray and Moore attempted to kill Joseph Melton because he was also an eyewitness to the murder.

In conformity with Rule 404(b), this evidence was not introduced and admitted to show Gray's bad character. Rather, the evidence of the murder the murder or Alvin Henson, obstruction of police investigation into the murder and the attempted killing of an eyewitness to the murder was introduced and admitted as proof of the method by which the conspiracy created, maintained, and controlled a particular marketplace, the Southeast, D.C. neighborhood, for the distribution of its drugs.

This evidence was also permissibly introduced and admitted as proof of the manner in which the organization's members protected their drug enterprise and individual members from detection, apprehension, and prosecution.

> b. *Evidence of the attempted murder of Joseph Melton was properly admitted*

■ As previously mentioned, the government introduced evidence that Gray and other members of the criminal enterprise attempted to kill Joseph Melton because he was an eyewitness to the murder of Alvin Henson.

The introduction and admittance of this evidence also did not contravene Rule 404(b)'s prohibition against "other crimes" evidence for the purpose of character assassination. Rather, the evidence was directly related to the charged crimes and the government's contention that the organization was not simply a drug selling enterprise. The government maintained that eyewitnesses to a murder committed by a member of the conspiracy threatened the continuity of the organization, and that murder was the method by which the organization eliminated threats and perpetuated itself. The government presented evidence that the organization engaged in frequent and extreme acts of violence in order to exploit, strengthen, perpetuate a reputation for violence, spread its wingspan, take over more areas, increase its cash flow, and preserve itself. Murder was as much in furtherance of the criminal drug enterprise as was the actual sale of narcotics.

The attempted murder of Joseph Melton served the organization's purposes of self-preservation and expansion for the purpose of attaining things of value, and was, therefore, properly introduced and admit-

ted as direct proof the charged conspiracies.

c. *Evidence of Gray's detention and multiple escapes from the Oak Hill juvenile facility was properly admitted.*

█ The government introduced evidence of the following. While at Oak Hill Juvenile Facility, Gray attempted to escape three times. Gray was assisted by Moore, who bribed a guard to smuggle wire cutters to Gray. While at Oak Hill, Gray also developed close relationships with key members of the criminal enterprise, namely Calvin Smith and Jermaine Vick. During this time, Gray also met persons who would later join the conspiracy, namely Kenneth Jackson, Donney Alston, and James Harden.

Admittance of this evidence conforms to the requirements and proscriptions of Rule 404(b). The government introduced this evidence to establish and explain the development of Gray's close relationships with the other members of the organization, as well as to tell the story of how Gray emerged as the leader of the organization. As such, this evidence was properly introduced and admitted because it is inextricably intertwined with and tells the stories of how relationships necessary to the establishment of the criminal enterprise began, developed, and operated within the conspiracy. Furthermore, the Court properly instructed the jury as to the admission of Gray's juvenile detention for this limited purpose.

d. *Evidence of the drug smuggling while Gray was incarcerated at D.C. Jail was properly admitted.*

█ The government introduced evidence that while incarcerated at D.C. Jail pending resolution of drug charges, Gray continued his role as leader of the organization. Evidence of his continued instruction and leadership was introduced through cooperators Andrea Gibbs and Maurice Andrews. Andrea Gibbs testified that she supplied drugs to Gray while he was in jail, and held drug money for him at her home while he was incarcerated. Maurice Andrews testified that he arranged the delivery of drugs and a cell phone to Gray at the D.C. Jail so that Gray could remain informed and instruct the organization while he was incarcerated.

The evidence of the D.C. Jail drug smuggling was properly admitted as direct proof of the continued existence of the criminal enterprise while Gray was incarcerated and how he controlled the drug conspiracy by maintaining an active leadership role while incarcerated. The evidence also explained the roles that Andrea Gibbs and Maurice Andrews served while working under Gray in the organization. This evidence was properly admitted for these purposes.

e. *The attempted murder of Damien Evans was properly admitted.*

█ The government introduced evidence through several witnesses that Gray attempted to kill Damien Evans because Gray believed that Damien Evans sold a stolen car to him. Frank Howard, Dennis Robinson, and Jermaine Vick, all of whom pled guilty and testified against Gray at trial, helped Gray find Damien Evans, and were present when Gray shot Damien Evans once in the face at point-blank range. The government introduced evidence that Damien Evans survived the attack because Gray's gun jammed when he attempted to shoot Damien Evans in the back of the head.

This evidence was properly admitted, consistent with Rule 404(b), as direct evidence of the existence and contours of the conspiracies, and the trusted and confidential relationships between Gray and the

members of the organization who aided and accompanied him in the attempted murder of Damien Evans in furtherance of the conspiracies. Additionally, the existence and depth of these relationships were in dispute because Gray denied that Frank Howard, Dennis Robinson, and Jermaine Vick were close associates and confidants. The government introduced this evidence to refute that claim. The evidence was also properly introduced and admitted to show the power and control that Gray exercised over other members of the organization, as evinced by how he directed their actions and vividly demonstrated how those who crossed him would be dealt with.

In addition, this evidence told the story of the degree to which maintenance of the reputation of the individual members of the organization, especially Gray, fueled acts of violence. The government introduced evidence that the sale of a stolen car to Gray was an insult, and threatened his status of the powerful and punishing head of the criminal drug-ring. The murder of Damien Evans was intended to reassert Gray's violent persona and leadership role. To the extent that reputation aided the maintenance and continuity of the criminal enterprise, evidence of the attempted murder of Damien Evans was also properly introduced and admitted for this purpose.

f. *Evidence of Nunn's drug trafficking was properly admitted.*

■ The government introduced evidence through Phyllis Webster, a cooperating witness who had a drug business relationship with Gray and Nunn, that Phyllis Webster and Nunn supplied drugs to one another from 1997 to 2000.

This testimony was properly introduced and admitted, within the boundaries of Rule 404(b), as direct evidence of the charged conspiracy because it was inextricably intertwined with Nunn's ability to enter into the criminal drug enterprise in 1998 and his role as its primary drug supplier until 1999. The evidence was also introduced to establish the mutually beneficial nature of the business relationship between Gray and Nunn. Nunn supplied drugs to Gray's criminal organization. In exchange for the drugs, Gray committed acts of violence and murder in furtherance of Nunn's drug trafficking activities. This mutually beneficial arrangement and the channel through which Nunn was able to supply drugs to Gray's organization, through his connection with Phyllis Webster, were direct evidence of how the criminal enterprise obtained drugs and financed itself.

g. *Evidence of Nunn's money laundering and evidence from the search of his residence were properly admitted.*

■ The government introduced evidence that during the period that Nunn supplied drugs to Gray's organization, Nunn was laundering drug money through a Bethesda, Maryland jewelry store and storing drug profits and paraphernalia at his home. The government introduced evidence that Nunn laundered money through a Bethesda jewelry store in 1998 and purchased a jewelry scale to weigh drugs and money. The government also introduced evidence that a search of Nunn's residence recovered three-hundred and forty thousand dollars in cash, a small quantity of heroin, a scale with heroin residue on it, a money counter, and a .380 pistol and ammunition. The government further introduced evidence of fifty-four thousand dollars in cash found in a safety deposit box linked to Nunn, and expert testimony that his financial status was most likely the result of a very lucrative drug trafficking business.

This evidence was properly introduced and admitted as direct proof of Nunn's significant supply of drugs to Gray's criminal enterprise and the benefit that he received from his relationship with the charged conspiracies. As such, the evidence was properly introduced and admitted on grounds similar to the admittance of Nunn's drug trafficking.

### h. *The cocaine found in Rodman Lee's Van after the Murder of Ricardo Bailey was properly admitted.*

■ The government introduced evidence of several grams of crack cocaine that the police found in Rodman Lee's van immediately after Gray murdered Ricardo Bailey.

The government introduced this evidence as direct proof that Gray murdered Ricardo Bailey to further his business relationship with Rodman Lee in the following manner. Gray thought that Ricardo Bailey was cooperating with the government against Rodman Lee. Gray murdered Ricardo Bailey in order to gain favor with Rodman Lee so that he would increase the quantity of drugs that he supplied to Gray. Evidence of the cocaine found in Rodman Lee's van after the murder of Ricardo Bailey was corroborative proof of the testimony of several former Gray associates who testified to the relationship between Gray and Rodman Lee and Gray's motive to murder Ricardo Bailey. As such, this evidence was properly introduced and admitted as evidence inextricably intertwined with the charged conspiracies and the organization's efforts to perpetuate itself and grow its business.

### B. *Indictment Discrepancies*

■ Discrepancy within the indictment as to the motive of an uncharged crime is not sufficient to justify a new trial. Gray maintains that indictment allegations related to the murder of Anthony Watkins are contradictory and warrant a new trial. Specifically, Gray argues that Overt Act 203 of the indictment states that Gray ordered the murder of Anthony Watkins "because the organization owed Watkins money," while, Racketeering Act 60 of the indictment states Gray ordered the murder of Anthony Watkins because "Watkins owed money to the organization." *Superceding Indictment, Count 1, Narcotics Conspiracy; Superceding Indictment, Count 3, RICO Conspiracy.* Gray maintains that this motive discrepancy warrants a new trial.

This discrepancy does not warrant a new trial for two reasons. First, where motive is not an element of the charged crime, the government is not required to present evidence of motive. Motive does not have to be an element of the charged offense, much less proved, to permit admission of uncharged crimes where the defendant generally denies committing the offense and the evidence helps to establish something otherwise permissible under Rule 404(b), such as identity. *Johnson v. United States,* 596 A.2d 980, 985 (D.C. 1991). Second, where an indictment includes alternative theories of liability, the government is only obligated to present evidence sufficient to support one of the theories. As the Supreme Court held in *Griffin v. United States,* a general jury verdict in a multi-count conspiracy charge is valid as long as it is legally supportable on at least one of the submitted grounds even though there is no assurance that a valid ground, as opposed to an invalid ground, was the actual basis for the jury's general verdict. 502 U.S. 46, 49, 112 S.Ct. 466, 116 L.Ed.2d 371(1991).

In this case, it was not necessary for the government to prove the motive behind Gray's murder of Anthony Watkins because the murder was introduced and admitted as an uncharged crime for the pur-

pose showing Gray's role in the charged conspiracies and his activities in furtherance of the charged conspiracies. Furthermore, analogous to *Griffin*, the jury in the instant case returned a guilty verdict in this multi-count RICO conspiracy case and the government presented multiple grounds and sufficient evidence for the jury to convict on the counts. Consistent with Supreme Court precedent, even if this Court were to find that the jury could have found Gray guilty on a charge for which the government did not present sufficient evidence, this Court is not in a position to speculate as to the jury's actual basis for the guilty verdict as long as the government presented at least one legally supportable ground on which the jury could have based its verdict. As such, the indictment discrepancy does not warrant a new trial.

For the aforementioned reasons, Kevin Gray's Motion for New Trial is DENIED.

## II. *Motion by Rodney Moore for New a Trial*

In his Motion for a New Trial,[3] Moore contends that the use of a stunbelt as a security device and one out-of-court deployment diminished his ability to participate in his own defense. However, the Court finds that the use of the stunbelt was justified and that its general use and one out-of-court deployment did not render Moore unable to participate in his own defense.

### A. *Findings*

In granting the government's pretrial motion to use stunbelts at trial, the Court considered the following information and made the following detailed findings.

The stunbelt at issue can be activated by a United States Marshal, and is capable of delivering an eight-second, fifty-thousand volt shock that temporarily immobilizes the wearer. The overall rate for accidental activations of the stunbelt, when viewed in comparison with the total number of times the belts have been used on individuals in police custody is less than 2 thousandths of a percent, or. 00015%, and general risks to safety and health are negligible. As an individualized safety matter, the government is required to review the medical records of potential wearers before the stunbelts can be used to ascertain whether the potential wearers have any specific health conditions that might preclude use of the stunbelts. Furthermore, extensive guidelines are supplied to a potential wearer and his or her counsel regarding all of the aforementioned information and how to prevent accidental activation. *United States v. Kevin Gray et al.*, 254 F.Supp.2d 1, 2 (D.D.C.2002) (citing Declaration of Dennis Kaufman).

Based upon this and other information contained in the record, the Court also made the following findings: 1) the defendants were facing serious charges, carrying the possible penalty of death or life in prison; 2) the defendants were willing to obstruct justice and posed a threat to the lives and safety of witnesses and their families; 3) all of the defendants had been convicted of violent crimes and/or gun charges; 4) there was substantial evidence of gang activity based on the indictment; 5) the U.S. Marshals Service had a clear preference for the use of stunbelts; 6) there would not be undue prejudice to the defendants from use of the stunbelts because the court would take measures to prevent the jury from becoming aware of their use; 7) there was a low likelihood of inadvertent or inappropriate activation; 8) there was no undue danger to any individual defendant if a stunbelt was activated;

---

**3.** Moore adopts Gray's Motion for New Trial, but since the Court denies Gray's Motion for New Trial, Moore has only this one additional argument.

9) the stunbelts were the most viable security device available under the circumstances; 10) the use of other measures were more likely to result in physical danger or legal prejudice to the defendants; and 11) there was a clear, written policy governing use of the stunbelts. *Gray*, 254 F.Supp.2d at 4–5.

The Court also drew on its previous experience using stunbelts in another case, *United States v. Edelin*, 175 F.Supp.2d 1 (D.C.Cir.2001). In granting the government's pretrial motion to use stunbelts in that case, the Court found that use of the stunbelts was constitutionally permissible and justified under facts very similar to the instant case. The Court's use of stunbelts in that case was favorable and at the end of that seven-month trial the Court observed that there were no accidental activations, the stunbelts proved unobtrusive and went unnoticed by the jurors and the stunbelts greatly reduced the need for other potentially prejudicial methods of security. The Court's experience in that case greatly influenced its decision to employ the stunbelts in the instant case.

### B. *Courtroom Security Case Law and Analysis*

#### 1. *Use of the stunbelt was justified.*

■ Given the facts of the case, as detailed by the Court's findings, use of the stunbelt as a security measure was justified and consistent with governing case law, as well as the law of other jurisdictions.

The United States Supreme Court and several circuit courts have approved the in-court use of security devices and security measures during trial. In *Illinois v. Allen*, the Supreme Court held that the measure of binding and gagging a defendant during a trial and in the presence of a jury was a constitutionally permissible method of courtroom security, although noting that binding and gagging should only be used as a last resort. 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). The Sixth Circuit, in *Kennedy v. Cardwell*, has deemed the use of physical restraints constitutional upon a fact-based finding that the defendant's situation, temperament, personal characteristics and physical condition, the physical layout of the courtroom and other security measures in place demonstrate a "clear showing of necessity." 487 F.2d 101, 110–11 (6th Cir.1973). Also, in *Fountain v. United States*, the Seventh Circuit held that a defendant may be "shackled in the presence of the jury upon a showing of 'extreme need,' which has been defined as 'necessary to maintain the security of a courtroom.'" 211 F.3d 429, 436 (7th Cir. 2000) (quoting *Lemons v. Skidmore*, 985 F.2d 354, 358 (7th Cir.1993)).

The common concern of *Allen, Cardwell* and *Fountain* was the prejudice that might befall a defendant when the members of the jury became cognizant of the level of physical security being used to maintain order and assure safety, hence the demonstration of need requisite to the use of such security measures.

Consistent with governing Supreme Court precedent and the circuit trend, use of the stunbelt in the instant case was justified under the circumstances. Although the trial was held in the secure courtroom, which was outfitted with bullet-proof glass, there was still a need for additional security measures because the bulletproof glass did not guarantee that Moore would refrain from using violence to injure other people or attempt to escape. As previously noted, Moore was facing the most serious penalties possible under the law, life imprisonment and death, had engaged in violent attempts to obstruct justice and posed a continued threat to court personnel, jurors, and witnesses. Use of the stunbelt was merited and befit the

intensity and potential for danger presented by Moore and the circumstances.

Use of the stunbelt was also the most viable and non-prejudicial security measure available for use in the situation. Even though the Court determined that the requisite need existed for the employment of extra security measures, it still had to balance the legal prejudice and practical concerns of Moore against these security needs. In so balancing, the Court found that the stunbelt was the least prejudicial method of security that the Court could employ given the high security concerns with which it was faced. Contrary to Moore's assertions, there would have been greater potential for physical danger and legal prejudice if other measures were used to secure the courtroom. If the stunbelt had not been used, additional Marshals would have had to be present for the trial proceedings, and the Court might have entertained the possibility of shackling Moore. The use of the stunbelt lessened the need for the presence of additional Marshals, reduced the likelihood that the Marshals might have to use more physical methods of control if an incident were to occur and eliminated the need to shackle Moore, a security measure that would be have been visible to the jurors and much more likely to prejudice the jury against him.

### 2. Use of the stunbelt did not prevent Moore from participating in his own defense.

The majority of courts that have addressed the use of stunbelts as a security measure have approved their use over a criminal defendant's vague concerns of that the use of stunbelts would somehow inhibit his ability to participate in his own defense. *United States v. Joseph*, 333 F.3d 587, 590–91 (5th Cir.2003), *cert. denied*, —— U.S. ——, 124 S.Ct. 446, —— L.Ed.2d ——, 72 U.S.L.W. 3281 (U.S. Oct. 20, 2003); *United States v. McKissick*, 204 F.3d 1282, 1299 (10th Cir.2000); *United States v. Brooks*, 125 F.3d 484, 502 (7th Cir.1997); *Lenz v. Warden*, 265 Va. 373, 380, 579 S.E.2d 194 (2003); *People v. Melanson*, 937 P.2d 826, 835 (Colo.App.1996); *Stanford v. State*, 272 Ga. 267, 528 S.E.2d 246, 249–50 (2000); *Young v. State*, 269 Ga. 478, 499 S.E.2d 60, 61 (1998); *Brown v. State*, 268 Ga. 354, 490 S.E.2d 75, 82 (1997). Moreover, where the use of stunbelts is accompanied by policies and the device itself is controlled only by trained personnel, unreasonable trepidation asserted by a defendant is unavailing and will not preclude use of the device. See *Melanson*, 937 P.2d at 835–36.

The use of stunbelts has only been disapproved when a trial court has failed to create a record of findings sufficient to support use of the device. *United States v. Durham*, 287 F.3d 1297 (11th Cir.2002) (vacating and remanding conviction for subsequent proceeding to make appropriate findings of fact); *Gonzalez v. Pliler*, 341 F.3d 897 (9th Cir.2003); *People v. Mar*, 28 Cal.4th 1201, 124 Cal.Rptr.2d 161, 52 P.3d 95 (2002).

Here, the Court made ample findings to support the use of stunbelt and took sufficient precautions to ensure that Moore had no reasonable consternation regarding his health or ability to participate at trial that would preclude use of use of the stunbelt.

First, as required by its own polices, the government conducted a health evaluation of Moore to ensure that he did not have health conditions that would be jeopardized by use of the stunbelt. Based on the government's review of his medical records and the representations of defense counsel, the Court found that there were no health-based reasonable causes for fear on the part of Moore that precluded or otherwise counseled against use of the stunbelt. Furthermore, the Court found no reason to prohibit use of the stunbelts based on

the remote possibility of harm, particularly when there was a serious risk that the lack of security could lead to the grave injury of another person.

Second, there was a clear written policy governing the use of the stunbelt that also obviated any reasonable trepidation. The written policy informed Moore that the stunbelt could be activated by a Deputy Marshal if he tampered with the stunbelt, failed to comply with a Marshal's verbal orders to halt movement, attempted to escape custody, took an action which indicated that he might attempt to inflict bodily harm to another person, or made an intentional attempt to avoid constant visual contact with a Marshal. *See United States Marshals Service, Gov. Motion for Use of Stunbelts in Capital Trial.* The guidelines for the activation of the stunbelt were sufficient to inform Moore of conduct that would trigger use of the stunbelt and steps that he could take to actively participate in his own defense without fear of activation.

Lastly, the one out-of-court deployment cited by Moore is not sufficient to find that use of the stunbelt prevented him from participating in his own defense. From this Court's own observations, Moore was alert and active in his own defense, before and after the one out-of-court deployment of the device. Moore even made an in-court objection during the death penalty phase of the proceedings. Furthermore, at no time during the trial did Moore put the Court on notice that he was having any physical or mental difficulties that prevented him from paying attention and engaging himself in the trial process. Moore, therefore, deprived the Court of the opportunity to review and remedy any existing situation, undermining his post-verdict claim that the one out-of-court deployment diminished his ability to participate in his own defense.

In sum, the stunbelt was the least prejudicial security device that the Court could

have used and the accompanying procedures and guidelines were sufficient to obviate any reasonable concern that Moore had about the effect of potential activation.

For the aforementioned reasons, Rodney Moore's Motion for New Trial is DENIED.

### III. *Motion by John Raynor for a New Trial*

In his Motion for a New Trial, Raynor argues that the Court's denial of his severance motion warrants a new trial because testimony elicited by other defense counsel and the government contained impermissible hearsay and opinion testimony that prejudiced his case. Raynor also maintains that the evidence proffered against him, specifically coconspirator testimony, was insufficient to convict him.

### A. *Case Law and Analysis*

#### 1. *Severance*

Federal Rule of Criminal Procedure 8 permits the joinder of defendants and charges where the charges arise from "transactions connected together or constituting part of a common scheme or plan," Fed.R.Crim.P. 8(a), and where "the defendants are alleged to have participated in 'the same series of acts or transactions constituting an offense or offenses.'" Fed. R.Crim.P. 8(b). The joinder of defendants and charges is favored in RICO and conspiracy cases. *United States v. Richardson*, 167 F.3d 621, 624 (D.C.Cir.1999).

However, joinder is improper where it allows the government to introduce evidence that would have been inadmissible if the trial were separate, or where there are significant disparities in the seriousness of the charged crimes because of the high risk of prejudice in such cases. *Richardson*, 167 F.3d at 624 (citing *United States v. Dockery*, 955 F.2d 50, 53

(D.C.Cir.1992)). For instance, a court should sever a joint trial where evidence against the one defendant would be "far more damaging" than the evidence against the other. *United States v. Tarantino*, 846 F.2d 1384, 1398 (D.C.Cir.1988). However, a defendant is not entitled to severance in order to avoid the "spillover" effect of evidence against other defendants where there is substantial independent evidence of each defendant's significant involvement in the conspiracy. *Tarantino*, 846 F.2d at 1398. Furthermore, barring a dramatic disparity, the trial judge is in the best position to review the degree of prejudice, and jury instructions are usually sufficient to minimize evidentiary disparities. *Id.* A court should also grant severance where the defendants allege mutually contradictory and irreconcilable defenses. *Id* at 1399. However, an order denying a defendant's motion to sever will not be disturbed absent a showing of abuse of discretion and a determination that a joint trial resulted in prejudice sufficient to deny due process of law. *United States v. Gbemisola*, 225 F.3d 753, 760–61 (D.C.Cir. 2000).

■ Here, Raynor fails to meet his burden of showing that a new trial would be in the interest of justice because his legal contentions do not meet the general legal standards for severance, or the standards for the more specific evidentiary bases that he asserts. Moreover, Raynor has failed to show that this Court abused its discretion, misapplied the law, or violated Raynor's due process rights by denying his severance motion for the following reasons.

First, joinder was proper. The defendants were charged in decade-long narcotics and RICO conspiracies. They were alleged to have engaged in the same acts or series of transactions in furtherance of the criminal drug conspiracies with which they were charged, often by actively aiding one another in the commission of crimes. Not, only did the defendants meet the definition of permissible joinder, but the type of conspired, complex and interdependent crimes with which they were charged favored application of the joinder rule. The evidence, in type and substance, was so similar for each defendant that the caution regarding joinder, spillover of otherwise inadmissible evidence, was obviated and did not pose a high risk of prejudice.

Second, the evidence as between defendants was not so disparate that severance was required. In fact, the defendants were charged in the same narcotics and RICO conspiracies for essentially the same types of crimes in furtherance of the conspiracy. Consistent with the law of this jurisdiction,

"[o]nce each [defendant] was tied to the conspirac[ies], the acts of each conspirator in furtherance of the conspirac[ies]' aims were attributable to all. The evidence and the charges were substantially overlapping, but the overlap was caused by the involvement of each appellant in [the conspiracies]. In these circumstances severance is not required."

*Tarantino*, 846 F.2d at 1399.

Here, Raynor has failed to allege a level of evidentiary disparity that would necessitate severance. The crimes charged in the conspiracies were simply too interdependent to warrant separate legal or administrative categorization. Furthermore, any overlap went to acts done in furtherance of the conspiracies after Raynor became a member of the organization, and any acts done in furtherance of either the narcotics or RICO conspiracy is attributable to him even if he was not directly involved in a specific event.

Third, Raynor's theory of defense did not irreconcilably conflict with any other defense theory to an extent that justified severance. All of the defendants asserted

some form of an "it wasn't me" defense. In this jurisdiction, the level of disparity and irreconcilability are very high, and the degrees of difference between the defenses in the instant case do not approach the bar of irreconcilable conflict that exists in this jurisdiction. *United States v. Wright*, 783 F.2d 1091, 1094 (D.C.Cir.1986) (holding that "[r]eversals under this standard … require a high degree of conflict between the defenses").

In *Wright*, two defendants, Wright and Moss, were charged in a kidnaping case. *United States v. Wright*, 783 F.2d 1091 (D.C.Cir.1986). Wright's defense was insanity, while Moss' defense was duress. The *Wright* court found that the level of disparity between these two objectively different and arguably contradictory defenses was insufficient to justify severance. Even upon Wright's further assertion that the prior murder of his lover was a substantial factor in his mental illness, and defendant Moss' counter that defendant Wright had, in fact, killed his lover, the court found that the conflicting defenses were not "so contradictory as to raise an appreciable danger that the jury would convict because of the inconsistency." *Wright*, 783 F.2d at 1091–94.

Raynor's defense, as compared with the other asserted defense theories, does not meet the irreconcilability bar, and Raynor does not even make a specific argument that a disparity existed.

Fourth, although maintaining that the testimony of Agent Sparks included impermissible and prejudicial hearsay, Raynor failed to cite any specific occurrence to this Court. As stated at the outset, the burden for demonstrating that a new trial is "in the interest of justice" lies with the movant. *Reese*, 561 F.2d at 902. Raynor's failure to cite an instance of hearsay to this Court is a failure to meet his burden.

Lastly, there was no prejudicial spillover of otherwise inadmissible opinion testimony that is legally sufficient to support Raynor's severance argument. Raynor maintains that the government and other defense counsel elicited opinion testimony from Agent Sparks that prejudiced Raynor's case. However, any opinion testimony that may have been elicited during Agent Sparks examinations was tempered by specific jury instructions that Agent Sparks personal views regarding guilt were not evidence and should not influence deliberations. A jury is presumed to have followed the Court's instructions. *Allen v. United States*, 603 A.2d 1219, 1224 (D.C. 1992). Therefore, the instruction given by the Court was legally sufficient to curb any prejudice that might have resulted from opinion testimony elicited from Agent Sparks. *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684, (1969); *Smith v. United States*, 392 A.2d 990, 994 (D.C.1978); *Bouknight v. United States*, 641 A.2d 857, 862 (D.C.1994). Raynor has proffered no arguments to overcome this presumption. Furthermore, having failed to object to the opinion testimony of Agent Sparks at trial, Raynor effectively waived his right to now claim that its introduction or admittance was improper.

2. *Sufficiency of Evidence—Coconspirator Testimony and Credibility Determinations*

Where a reasonable trier of fact, viewing evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the government as required, finds that the government proved the requisite elements of an offense beyond a reasonable doubt, post-trial sufficiency of evidence arguments made by a convicted defendant will fail, *Richardson*, 167 F.3d at 625; *United States v. Dingle*, 114 F.3d 307, 310 (D.C.Cir.1997), especially where such would intrude upon the province of the

jury. *United States v. Thornton,* 746 F.2d 39, 45 (D.C.Cir.1984).

▮▮▮▮ The duty of weighing witness credibility, resolving factual conflicts, and determining the inferences to by drawn from the evidence lies with the jury. *Metrocare v. Washington Metropolitan Area Transit Authority,* 679 F.2d 922, 925 (D.C.Cir.1982) (holding that "[t]he trial court may not assess the credibility of the witnesses or weigh the evidence [because] [i]t is the essence of the jury's function to select, from among conflicting inferences and conclusions, that which it finds most reasonable") (internal quotations omitted); *United States v. Cox,* 509 F.2d 390, 391–92 (D.C.Cir.1974). A reviewing court may not substitute its own credibility assessments for that of the jury. *Boodoo v. Cary,* 21 F.3d 1157, 1161 (D.C.Cir.1994). Rather, a reviewing court's "task is limited to evaluating whether [the government] proffered 'sufficient evidence upon which a jury could properly base a verdict.' " *Boodoo,* 21 F.3d at 1161 (quoting *Richardson v. Richardson,* 857 F.2d 823, 828 (D.C.Cir. 1988)). A jury conviction should not be reversed on the basis of insufficient evidence unless the court can conclude, that as a matter of law, no reasonable juror could have convicted on the evidence presented. *United States v. Alexander,* 331 F.3d 116, 128 (D.C.Cir.2003); *United States v. Weisz,* 718 F.2d 413, 438 (D.C.Cir.1983).

Here, Raynor asserts that the testimony of government cooperators was so inherently unreliable that his conviction on the basis of it warrants a new trial. Raynor is incorrect on several counts.

First, there is no case law supporting the premise that coconspirator testimony is so inherently unreliable that a conviction largely based on it is insufficient. *Bourjaily v. United States,* 483 U.S. 171, 182, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (holding the Sixth Amendment does not require independent indicia of reliability for admission of coconspirator statements over an objection based on the confrontation clause). To the contrary, case law, although justifiably wary of coconspirator testimony, recognizes the inherent value of insider information. *Bourjaily,* 483 U.S. at 183, 107 S.Ct. 2775 (discussing that the value of coconspirator statements is "firmly rooted" and "steeped" in our jurisprudence).

Consistent with Supreme Court precedent, the law of this jurisdiction considers coconspirator testimony reliable when corroborated by other evidence evincing an indicia of reliability, including self-consistency. *In re Sealed Case,* 246 F.3d 696, 700 (D.C.Cir.2001). Here, the government presented both direct and circumstantial evidence that corroborated the testimony of the coconspirators. As stated previously in another context, where a jury returns a verdict of guilty, a court is not in a position to speculate as to which evidence the jury used to make its determination as long as the government presented legally supportable evidence upon which their decision could have been based. *Griffin,* 502 U.S. at 49, 112 S.Ct. 466. Such is the case here. The jury could have relied solely on the information provided by the coconspirators, however, that is highly unlikely given all of the corroborating evidence with which it was also presented. Either way, this Court will not act as though it were a spectator in the jury deliberation room by guessing as to what the basis of the jury's decision may have been.

Third, to the extent that the law is distrustful of such testimony, there are procedural and evidentiary safeguards to aid a jury in placing this type of testimony in perspective. Those safeguards were used in this case. Here, the Court began and ended the trial process with instructions that squarely alerted the jury to the fact

that it had to be critical of coconspirator testimony.

For the aforementioned reasons, John Raynor's Motion for New Trial is DENIED.

IV. *Motion by Timothy Handy for a New Trial*

In his Motion for a New Trial, Handy maintains that: 1) he was convicted on insufficient evidence; 2) the government failed to prove that he joined the conspiracy in the mid–1990s; 3) he was denied opportunity to confront the government's evidence; and 4) the government's rebuttal argument was improper.

A. *Sufficiency of the Evidence Proffered Against Handy*

■ Incorporating the law discussed in section III(A)(2) of this memorandum opinion, the Court rejects Handy's insufficiency of the evidence argument, finding that, viewing Handy's conviction in the light most favorable to the government, a reasonable trier of fact could have found that the evidence presented was sufficient to find guilt. *United States v. Thompson,* 279 F.3d 1043, 1050–51 (D.C.Cir.), *cert. denied,* 537 U.S. 904, 123 S.Ct. 233, 154 L.Ed.2d 179 (2002). The government presented evidence that Handy was a hitman for the organization through the testimony of coconspirators, investigators and eyewitnesses, including the eyewitness testimony of Margarita Simmons. This Court finds no reason to, and it will not, invade the province of the jury by reevaluating the jury's credibility assessments of those witnesses and the weight of the evidence presented. *United States v. Johnson,* 589 F.2d 716, 720 (D.C.Cir.1978).

B. *Evidence of Handy's Entry into the Conspiracy*

■ Handy contends that the government did not present sufficient evidence

that he joined the conspiracy in the mid–1990s and that the allegation in Count One of the indictment was so vague that he could not properly prepare a defense.

Again, incorporating the law discussed in section III(A)(2) of this memorandum opinion, the Court rejects Handy's insufficiency of the evidence argument, finding that there was sufficient evidence, including the corroborated testimony of Maurice Andrews that Handy agreed to sell drugs and murder people for the organization in 1996, upon which a jury could have found that Handy entered the conspiracy in the mid–1990s. Pursuant to the law of this jurisdiction, the Court's inquiry into sufficiency of the evidence ends here.

The Court has already addressed the issue of the indictment's particularity. During pretrial litigation this Court denied the defendants' motions for a bill of particulars after finding that indictment alleged charges with specificity sufficient to allow the defendants to prepare their defenses. Handy has presented no evidence to the Court that would justify reevaluation of that pretrial finding.

C. *Handy's Right to Confront Evidence Against Him*

■ Handy also argues that the jury should have been told that the government dismissed Superior Court charges against him relating to the murders of Richard Simmons and Demetrius Green.

First, Handy was afforded ample opportunity to confront the government's evidence against him. Before the trial started, Handy was provided with all requested discovery and potential *Brady* information related to the charges against him. Therefore, Handy had all of the necessary information to confront the evidence that the government proffered against him.

Second, Handy's claim that the jury should have known that the government dismissed Superior Court charges against him related to the murders of Richard Simmons and Demetrius Green is without merit because that information was irrelevant to the jury's charge to evaluate him in the instance case only upon the evidence presented at trial. Moreover, decisions regarding the forum in which the government will prosecute are a matter of prosecutorial discretion. *Price v. United States,* 531 A.2d 984, 987 (D.C.1987); *Town of Newton v. Rumery,* 480 U.S. 386, 387, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987) (discussing the "general judicial deference to prosecutorial discretion in bringing criminal charges"). All the jury need be informed of is that the defendant was charged in an indictment on specific counts. The government's strategy of choice of forum is not relevant to the jury's deliberations on the crimes charged and the evidence presented.

### D. *Government's Rebuttal Argument*

 Handy also maintains that the government's rebuttal regarding his defensive alibi to the murder of Demetrius Green was improper. The Court finds that this argument is also without merit.

The primary purpose of rules limiting rebuttal argument is to protect the defendant from unfair surprise. *United States v. Childress,* 58 F.3d 693, 718 (D.C.Cir. 1995) (holding that defense counsel's statement during closing argument invited response by prosecutor in rebuttal); So, for instance, comments that are beyond the scope of rebuttal are usually impermissible. However, there was no such surprise in the instant case because the prosecutor's comments were in response to contentions that the defendant set forth during trial and in his closing argument.

During the trial, Handy presented the jury with testimony and documents to show that he was employed as a carpenter's apprentice and worked at that job on the day of Demetrius Green's murder. Handy also discussed this testimony and evidence in his closing. In proper form, the government rebutted that Handy's work records may have demonstrated that he had a job, but were not alibis for the date and time of the murder. This Court finds that there was nothing improper, beyond scope, or surprising about the government's response to Handy's evidentiary and closing assertions. Therefore, this Court finds that the government's rebuttal was proper.

For the aforementioned reasons, Timothy Handy's Motion for New Trial is DENIED.

### V. *Motion by Lionel Nunn for a New Trial*

In his Motion for a New Trial, Nunn maintains that: 1) the Court admitted improper Rule 404(b) evidence; 2) the government's cooperating witness agreement with Steve Graham violated the federal bribery statute; 3) the Court's denial of his severance motion was prejudicial; and 4) the government's witnesses lacked credibility.

### A. *Evidence Admitted Consistent with Rule 404(b)*

 The government introduced the following evidence: 1) the testimony of Phyllis Webster that she purchased from and supplied cocaine to Nunn while he was participating in the charged conspiracies; 2) the 1998 surveillance of his money laundering activities at a Bethesda, Maryland jewelry store; 3) the search of his home and the recovered items; and 4) the expert analysis and conclusion that his financial status was the result of successful drug trafficking. Nunn argues that this evidence was introduced and admitted in con-

travention of Rule 404(b)'s prohibition on "other crimes" evidence.

Incorporating the law discussed in section I(A) of this memorandum opinion, the Court finds that the evidence of Nunn's drug trafficking and the specific evidence through which it was introduced was properly introduced and admitted as direct evidence of his participation in the charged conspiracies.

Phyllis Webster's testimony established that Nunn was a major drug supplier in the mid–1990s and explained the story of how he was able to enter into the charged conspiracies during that period and become the primary drug supplier for the Gray organization. Phyllis Webster's testimony was also proof of the Gray organization's drug trafficking activities, plan, intent and method because there was significant overlap in the time and manner in which Nunn engaged in drug transactions with Phyllis Webster and Gray.

Evidence introduced regarding Nunn's money laundering through the Bethesda jewelry store, the search of his home, and the analysis of his financial status was also direct intrinsic evidence of Nunn's membership and participation in the charged conspiracies, and provided corroborating support for other intrinsic evidence of the same supplied by the testimony of Nunn's associates.

For the aforementioned reasons, the evidence of Nunn's drug trafficking activities was properly introduced and admitted in conformity with Rule 404(b).

B. *The Federal Bribery Statute*

 Nunn maintains that the government's Rule 35 motion, requesting a sentence reduction for Steve Graham, who testified against Nunn, was in violation of the federal bribery statute. The Court finds that there was nothing factually or legally improper about the government's

agreement with Steve Graham or the Rule 35 motion that it filed on his behalf.

Factually, nothing in the record indicates improper activity by the government. Steve Graham was charged in an initial indictment, separate from Lionel Nunn, for engaging in narcotics and RICO conspiracies, and arrested shortly thereafter. Soon after Steve Graham's arrest, the government approached him about pleading guilty and cooperating, but he refused. Steve Graham went to trial in July of 2000 and was found guilty. On November 6, 2000, Steve Graham was sentenced by this Court to a term of 210 months in prison.

In December of 2001, the Court of Appeals appointed new counsel from the Federal Public Defender's Office to Steve Graham's case. The Federal Public Defender gave legal counsel to Steve Graham, fully informing him of his rights and options. The Public Defender contacted the government in March of 2002 and expressed that Steve Graham was interested in cooperating with the government. Government prosecutors met with Steve Graham on several occasions, and, on October 11, 2002, the government and Steve Graham entered into an agreement that obligated Steve Graham to truthfully cooperate and testify in the instant matter and possibly others. The agreement also documented that the usefulness of the information supplied by Steve Graham could not have reasonably been anticipated by him until more than a year after his sentencing and that he promptly provided information to the government after its utility was reasonably apparent to him. At the time of the agreement, the government also agreed to file a Rule 35 motion on Steve Graham's behalf, detailing the nature and extent of his cooperation. The agreement also documented that the government's assent to file a Rule 35 motion on Steve Graham's behalf did not obligate it to support his request for a sentence reduction.

The Court finds that the government's initial actions and later agreement with Steve Graham evince no factual irregularities or improprieties. The Court further finds that the government's agreement with Steve Graham is consistent with federal law, as discussed below.

■■■ Rule 35(b)[4] permits the government to move, within one year of sentencing, to reduce a defendant's sentence to reflect his subsequent substantial assistance in the investigation or prosecution of another person. Fed.R.Crim.P. 35(b). Contrary to Nunn's contention, it is well established that the federal bribery statute does not preclude the government from agreeing to grant leniency to a defendant in exchange for truthful testimony. *United States v. Ramsey*, 165 F.3d 980, 986–88 (D.C.Cir.1999). As held by the D.C. Circuit in *Ramsey*, "application of [the bribery statute] to the United States would deprive the sovereign of a critically important interest, one that is well established in our legal system and recognized by the courts, the Congress, and more recently, the United States Sentencing Commission." *Ramsey*, 165 F.3d at 988.

The record in this case and the proffers made to this Court establish that Steve Graham could not have reasonably anticipated the usefulness of the information that he possessed until after December of 2001, over a year after his sentencing. Steve Graham's testimony makes clear that prior to the appointment of his new counsel in December of 2001, he was represented by an attorney who failed to inform him the relevance of his cooperation with the government and its import at the time. Steve Graham's former counsel failed to inform him about the routine terms of cooperating with the government, much less how the information that he possessed fit into the complex case presented by the government. The Public Defender appointed to Steve Graham's case in December of 2001 promptly explained the terms of government cooperation and armed him with the facts he needed to make an informed decision about whether to cooperate with the government. Armed with these facts, Steve Graham decided to cooperate with the government with the understanding that his cooperation did not guarantee a recom-

4. Federal Rule of Criminal Procedure 35(b):

(b) Reducing a Sentence for Substantial Assistance.
(1) In General. Upon the government's motion made within one year of sentencing, the court may reduce a sentence if:
 (A) the defendant, after sentencing, provided substantial assistance in investigating or prosecuting another person; and
 (B) reducing the sentence accords with the Sentencing Commission's guidelines and policy statements.
(2) Later Motion. Upon the government's motion made more than one year after sentencing, the court may reduce a sentence if the defendant's substantial assistance involved:
 (A) information not known to the defendant until one year or more after sentencing;
 (B) information provided by the defendant to the government within one year of sentencing, but which did not become useful to the government until more than one year after sentencing; or
 (C) information the usefulness of which could not reasonably have been anticipated by the defendant until more than one year after sentencing and which was promptly provided to the government after its usefulness was reasonably apparent to the defendant.
(3) Evaluating Substantial Assistance. In evaluating whether the defendant has provided substantial assistance, the court may consider the defendant's presentence assistance.
(4) Below Statutory Minimum. When acting under Rule 35(b), the court may reduce the sentence to a level below the minimum sentence established by statute.

mendation for sentence reduction. The government later filed a Rule 35 motion, detailing Steve Graham's cooperation, and chose to recommend a sentence reduction, as it was permitted, but not required by law or agreement, to do.

Finding that the government's actions, the timing and substance of the cooperation agreement and the Rule 35 motion filed on Steve Graham's behalf were consistent with the law, this Court finds that there was no violation of the federal bribery statute.

### C. *Severance*

█ Incorporating the law discussed in section III(A)(1) of this memorandum opinion, the Court finds that Nunn's motion for severance was properly denied.

As previously discussed in relation to Raynor, joinder was proper in this case. There is a strong presumption that defendants jointly charged with committing an offense will be tried together. *Richardson*, 167 F.3d at 624. Like the other defendants, Nunn was charged in criminal narcotics and RICO conspiracies that spanned over a decade. He was alleged to have engaged in the same acts and series of transactions in furtherance of the conspiracy as the other defendants. Fed. R.Crim.P. 8(a)-(b). Moreover, the complexity and interrelation of the charged conspiracies made the joinder of all of the defendants, including Nunn, favorable. Furthermore, the potential for "spillover" prejudice was legally negligible in light of the compelling evidence that the government presented against Nunn.

### D. *Witness and Evidence Credibility Assessments*

█ Lastly, Nunn argues that the testimonial discrepancies between government witnesses warrant a new trial. The Court finds that Nunn's argument fails for the following reasons.

As previously discussed in section III(A)(2) of this memorandum opinion, it was within the province of to weigh the credibility of witness testimony and evaluate and resolve conflicting evidence, including any discrepancies that may exist among witnesses. *Metrocare*, 679 F.2d at 925. The jury in this case was so charged. The Court further instructed the jury that:

> "[i]nconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit such testimony. Two or more persons witnessing an incident or transaction may see or hear it differently. An innocent misrecollection, like failure of recollection is not an uncommon experience in life." *See Criminal Jury Instructions for the District of Columbia, 4ths ed. (2002), Instruction 2.11.*

Moreover, the government presented sufficient physical and corroborating evidence, such as recorded phone conversations between Nunn and Gray, providing the jury with more than a legally sufficient quantity and quality of evidence upon which to convict Nunn. *Boodoo*, 21 F.3d at 1161. In accordance with governing law, the Court will not substitute its own judgment for that of the jury by assessing witness credibility or weighing the evidence. *Id.*

### CONCLUSION

Upon consideration of the defendants' New Trial Motions, the Court, having determined that none of the defendants' motions set forth facts or legal argument sufficient to warrant a new trial, hereby, DENIES each defendant's motion for new trial.

SO ORDERED.